PEOPLE v FIELDS

OPINION OF THE COURT

1. INFANTS—PROBATE COURT—JURISDICTION—WAIVER—CRIMINAL LAW
   —JUVENILE COURT RULES.

   Juvenile Court Rules of 1969 and any question pertaining to a
   provision in those rules regarding the criteria for waiver of
   jurisdiction pursuant to a statute, providing for waiver by the
   probate court of jurisdiction of a child over the age of 15 years
   accused of any act the nature of which constitutes a felony,
   have no application to whether the lack of standards in the
   statute precludes a waiver proceeding where the probate judge
   entered an order waiving jurisdiction to the circuit court of a
   16-year-old child when those juvenile court rules were not in
   effect (JCR 1969, 1–11).

2. INFANTS—STATUTES—PROBATE COURT—JURISDICTION—WAIVER—
   CRIMINAL LAW—STANDARDS—DISCRETION—SUPREME COURT.

   Under a statute, providing for waiver by the probate court of
   jurisdiction of a child over the age of 15 years accused of any
   act the nature of which constitutes a felony, the law leaves it
   solely up to the judgment of each probate judge to formulate
   his own criteria for waiver of jurisdiction and the basis for
   waiver could be as varied as the number of probate judges,
   because the law is so vague that its application is nothing more
   than *carte blanche* grant of discretion to each probate judge to
   exercise his own wisdom and compassion as to what he thinks
   should be done in each case that comes before him upon a
   request for waiver and, accordingly, the prior decision of the

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 10] 47 Am Jur 2d, Juvenile Courts and Delinquent and Depen-
   dent Children § 19.
[3] 50 Am Jur, Statutes §§ 60, 475.
[4, 5, 9, 11–18, 20] 16 Am Jur 2d, Constitutional Law § 552.
[6, 8] 1 Am Jur 2d, Administrative Law § 100 *et seq.*
[7] 2 Am Jur 2d, Administrative Law § 187 *et seq.*
[19] 47 Am Jur 2d, Juvenile Courts and Delinquent and Dependent
   Children §§ 60–62.

Michigan Supreme Court in this case should be reaffirmed, which reversed the order of the probate judge waiving jurisdiction to the circuit court of a 16-year-old child (MCLA 712A.4).

3. INFANTS—STATUTES—CONSTITUTIONAL LAW—COURTS—JURISDICTION —PROBATE COURT—WAIVER—CRIMINAL LAW—DECISIONS—PROSPECTIVE EFFECT—RETROACTIVE EFFECT.

Justice and reality will be served by holding that the decision by the Michigan Supreme Court that a statute, providing for waiver by the probate court of jurisdiction of a child over the age of 15 years accused of any act the nature of which constitutes a felony, was unconstitutional should be given prospective effect with retroactive effect limited to those cases pending prior to October 3, 1972, the date an amendment to that statute was signed into law and given immediate effect, in which the issue of waiver was raised before the trial court and properly preserved on appeal; waivers otherwise granted prior to the date of this decision and not contested upon proper preservation of the issue should not be affected (MCLA 712A.4).

### DISSENTING OPINION

### T. G. KAVANAGH and LEVIN, JJ.

4. STATUTES—STANDARDS—COURT RULES—JUDICIAL OPINION.

*A controlling standard can be "determined" even though no standard is explicitly stated in a statute itself: adoption of a court rule, or the filing of a judicial opinion articulating a rule of law which henceforth controls.*

5. INFANTS—STATUTES—STANDARDS—PROBATE COURT—JURISDICTION— WAIVER—CRIMINAL LAW—CONSTITUTIONAL LAW—DISCRETION— APPEAL AND ERROR.

*The absence in the statute, providing for waiver by the probate court of jurisdiction of a child over the age of 15 years accused of any act the nature of which constitutes a felony, of carefully defined standards does not oblige the Michigan Supreme Court to hold the waiver provision unconstitutional; nevertheless there is a need to formalize criteria outlining an ordered structure within which discretionary power may be exercised as, unless criteria are formalized, a lawyer representing a juvenile cannot effectively prepare his case, the judge is without a guide to assist him in exercising his discretion, and effective appellate review is impeded (MCLA 712A.4).*

6. Constitutional Law—Separation of Powers—Legislature—
   Delegation of Power—Nondelegation Doctrine—Adminis-
   trative Law—Courts—Law of the Case.

   *The principle of three separate branches of government and of
   separation of powers is basic, but the constitution does not
   expressly prohibit the Legislature from delegating law-making
   power; despite the constant iteration of the nondelegation
   doctrine, governmental officials, administrative agencies and
   other authorities, including the courts, daily make and remake,
   apply and fail to apply rules which they, earlier or ad hoc,
   themselves establish that have "the effect of law"; those rules
   and regulations are often the only law that counts—the law
   that governs disposition of the case at hand.*

7. Administrative Law—Administrative Code—Code of Federal
   Regulations—Rules—Regulations.

   *Restraints and directives, embodied in the Michigan Administra-
   tive Code and the Code of Federal Regulations, are no less
   binding because they are called rules and regulations, and are
   not "laws".*

8. Infants—Statutes—Standards—Probate Court—Jurisdiction—
   Waiver—Criminal Law—Legislature—Delegation of
   Power—Discretion—Constitutional Law.

   *To insist that the absence of standards in a statute, providing for
   waiver by the probate court of jurisdiction of a child over the
   age of 15 years accused of any act the nature of which consti-
   tutes a felony, is necessarily fatal would be stultifying because
   the Legislature must be allowed to delegate law-making power
   and delegations may be sustained although unaccompanied by
   standards, or under statements of purported standards so gen-
   eral that they do not confine, but, rather, stretch the discretion
   exercisable to the outer limits of reasonable, and, therefore, of
   constitutional exercise of power, now that it is recognized that
   the purpose of the nondelegation doctrine is the deeper one of
   protecting against unnecessary and uncontrolled discretionary
   power, and that the focus should be one of the totality of
   protections against arbitrariness, including both safeguards and
   standards (MCLA 712A.4).*

9. Infants—Statutes—Delegation of Power—Probate Court—Ju-
   risdiction—Waiver—Criminal Law—Standards—Discretion
   —Appeal and Error.

   *Delegation of discretionary powers in a statute, providing for
   waiver by the probate court of jurisdiction of a child over the*

age of 15 years accused of any act the nature of which constitutes a felony, is plainly supported by the factors that a seemingly vague standard will usually be sustained if it is susceptible of definition by reference to well established legal concepts, that in areas where the delegation of broad discretionary powers is supported "by long tradition", delegations cast in terms that leave wide discretion are often upheld, and that where judicial review is available to correct abuses, especially where the scope of review is not unduly limited, delegations of broad discretionary power have been sustained (MCLA 712A.4).

10. INFANTS—PROBATE COURT—JURISDICTION—WAIVER—CRIMINAL LAW—CIRCUIT COURT—COURT OF APPEALS—SUPREME COURT—APPEAL AND ERROR.

Probate court order waiving juvenile jurisdiction of a child over the age of 15 years accused of an act the nature of which constitutes a felony was and, after the 1970 amendments governing appeals of orders of the probate court, continues to be appealable as of right to the circuit court and even before trial, the Michigan Court of Appeals and the Michigan Supreme Court may grant leave to appeal a decision of the reviewing circuit court if it appears that further appellate review is justified (MCLA 712A.4, 712A.22).

11. INFANTS—PROBATE COURT—STATUTES—JURISDICTION—WAIVER—CRIMINAL LAW—CONSTITUTIONAL LAW—STANDARDS—HEARING—JUDICIAL REVIEW.

There was and is no need to declare the waiver of juvenile jurisdiction provision of a statute unconstitutional which statute provided for waiver by the probate court of jurisdiction of a child over the age of 15 years accused of any act the nature of which constitutes a felony; the Michigan Supreme Court has ample power, which it has exercised both decisionally and through rule making on countless occasions, to provide adequate standards to guide judges in reaching their decisions, and to make both the hearing process and judicial review meaningful (MCLA 712A.4).

12. INFANTS—COURT RULES—PROBATE COURT—JURISDICTION—WAIVER—CIRCUIT COURT—FACT FINDING.

Although the juvenile court rule requiring fact finding had not been adopted when jurisdiction over a juvenile was waived to circuit court by a probate court judge, an examination of the judge's statement of reasons makes it apparent that this requirement was satisfied (JCR 1969, 11.6).

13. Administrative Law—Standards—Legislature—Statutes—Courts—Constitutional Law.

*The standards test is a judicial safeguard against the action of administrative officials and agencies, not against judicial action; while the courts have refused to allow legislatures to impose nonjudicial functions on them, there is little support for the proposition that a legislative °act which confers power on a court is constitutionally deficient because it lacks standards to guide the court in discharging its judicial duty.*

14. Words and Phrases—Discretion—Standards.

*Discretion conferred "in the legal sense of that term" is discretion guided by a standard that represents the very antithesis of arbitrary power.*

15. Constitutional Law—Delegation of Power—Statutes—Legislature—Standards—Courts—Discretion.

*An act of the Legislature is not necessarily unconstitutional because it delegates power without standards, whether the delegation be to an officer, agency or court; but it is desirable for appellate courts to formalize criteria for the exercise of trial judge discretion as they have required in the case of agency discretion.*

16. Statutes—Legislature—Standards—Discretion—Judicial Discretion.

*The failure of the Legislature to promulgate standards does not gainsay the desirability of requiring guidelines for the exercise of discretionary power; the solution is to formalize sound criteria to govern in future cases now that the need and desirability of structuring the exercise of judicial discretion has been recognized.*

17. Infants—Probate Court—Jurisdiction—Waiver—Standards—Statutes—Court Rules—Legislature—District and Prosecuting Attorneys—Discretion—Constitutional Law—Criminal Law.

*To hold that an adjudication by a probate judge, waiving juvenile jurisdiction of a child over the age of 15 years accused of an act the nature of which constitutes a felony, guided by fundamentally the same highly generalized multichoice standards now formalized by court rule and statute, was defective because the Legislature was unaware that its imprimatur should be added to the judicially-developed standards simply makes no sense, in the context of the prosecutor's almost unlimited discretion in*

*charging, a power not constitutionally established but delegated to him by the Legislature, power which the Legislature manifestly could structure by more carefully defining the various penal offenses, power exercised without any of the safeguards that accompany the judicial process (Const 1963, art 7, § 4).*

18. COURTS—ADMINISTRATIVE LAW—STANDARDS—DISCRIMINATION—DISCRETION—HEARING—NOTICE—ATTORNEY AND CLIENT—JUDICIAL REVIEW—COURT RULES.

*Standards cannot prevent the arbitrary exercise of power and unjustified discrimination in its administration; the primary safeguards against abuse of discretion by agencies and judges alike are the rights to an evidentiary hearing after proper notice, to representation by counsel and to judicial review upon a transcribed record of the judge's decision elucidated with a statement of facts found and reasons for decision and these safeguards are now formalized in the Juvenile Court Rules of 1969.*

19. INFANTS—WAIVER—CRIMINAL LAW—APPEAL AND ERROR.

*The means of protecting juveniles who are improvidently waived to a court of general criminal jurisdiction is appellate intervention.*

DISSENTING OPINION

T. G. KAVANAGH, J.

20. INFANTS—PROBATE COURTS—JURISDICTION—WAIVER—CRIMINAL LAW—STATUTES—STANDARDS—CONSTITUTIONAL LAW—DISCRETION.

*Giving up insistence on legislatively articulated standards as a constitutional touchstone to define the Michigan Supreme Court's efforts to safeguard against abuse of discretion makes better sense and better law than a decision that the statute providing for waiver by the probate court of jurisdiction of a child over the age of 15 years accused of any act the nature of which constitutes a felony is unconstitutional because it lacks standards (MCLA 712A.4).*

Appeal from Court of Appeals, Division 2, Bronson, P. J., and Fitzgerald and Churchill, JJ., affirming Washtenaw, John W. Conlin, J. Submitted April 4, 1972. (No. 6 April Term 1972, Docket No. 53,287.) Decided July 26, 1972. Submitted on re-

hearing October 4, 1972. (No. 8 October Term 1972.) Decided March 19, 1974.

30 Mich App 390 reversed.

Andrew B. Fields, 16 years old, was accused in probate court of acts the nature of which constitute felonies. Order entered waiving jurisdiction to circuit court. Defendant appealed to circuit court. Affirmed. Defendant's application for leave to appeal to the Court of Appeals denied. Defendant's application for leave to appeal to the Supreme Court granted and case remanded to Court of Appeals. 383 Mich 761. Affirmed. Defendant appealed. Reversed. 388 Mich 66. Rehearing granted. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *Karl V. Fink, John J. Hensel,* and *Leonhard J. Kowalski,* Assistant Prosecuting Attorneys, for the people.

*Clan Crawford, Jr.,* for defendant.

Amicus Curiae: Michigan Probate and Juvenile Court Judges Association (by *Mary Coleman).*

Juvenile Problems Committee (by *Rosemary Scott,* Chairman).

Prosecuting Attorneys Association of Michigan (by *James K. Miller, Bruce A. Barton, Edward G. Durance, Thomas G. Plunkett, Thomas R. Lewis, William L. Cahalan, Dominick R. Carnovale,* and *Leonard Meyers).*

ON REHEARING

T. M. KAVANAGH, C. J. In December, 1968 the
Circuit Court of Washtenaw County ruled that
MCLA 712A.4; MSA 27.3178(598.4), allowing the
probate court to waive jurisdiction over certain
juveniles, thus allowing them to be tried as adults,
was not unconstitutional. The Court of Appeals,
upon remand from this Court, upheld this decision.
30 Mich App 390; 186 NW2d 15 (1971). This Court
granted leave and entered a decision reversing
these lower courts. 388 Mich 66; 199 NW2d 217
(1972). Rehearing was granted and the case was
again before us for decision. Justices BLACK and
ADAMS each circulated proposed opinions. Before
final decision, the terms of Justices BLACK and
ADAMS on the Court expired.

On January 22, 1973, on the Court's own mo-
tion, the Court granted rehearing without oral
argument and upon the briefs previously filed. We
hereby adopt the opinion of Justice ADAMS, circu-
lated November 20, 1972. This author has added
footnotes 3 and 4 to bring the opinion to date and
has changed the wording in the third sentence
from the end on page 221, but not the content
thereof.

Justice BLACK, in the opening paragraph of his
first opinion in this case *(People v Fields,* 388 Mich
66; 199 NW2d 217 [1972]), stated the issue as
follows:

"The reviewable question is whether 1948 CL 712A.4;
MSA 27.3178(598.4) is unconstitutional for *want of
standards* governing probate determination of how a
juvenile over the age of 15 years, accused of any act the
nature of which constitutes a felony, may be waived to
circuit court for trial." (Emphasis added.)

Judge Mary Coleman, in her Amicus Curiae

brief of Michigan Probate and Juvenile Court Judges Association, stated the issue as follows:

"The principal issue being argued in this case is the extent to which the legislature may delegate power to another body or agency. Such delegation must include *sufficient standards* so as to obviate any delegation of legislative power. The legislature may not delegate the power to make laws." (Emphasis added.)

In my first opinion *(People v Fields,* 388 Mich 66 [1972]), I said (p 75):

"It is important to understand the precise issue in this case. It is *not* whether the constitutional requirements of due process stated in *Kent v United States,* 383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966), were met. Rather, it is whether the *lack of standards* in the statute preclude a waiver proceeding." (Emphasis added.)

At this time, it is necessary to state what is not involved in this case because so much has been written that tends to obfuscate the issue. This case was decided by Probate Judge O'Brien on August 16, 1968. The Juvenile Court Rules of 1969 were adopted December 5, 1968 and went into effect March 1, 1969. The Juvenile Court Rules were not in effect when this case was decided by the probate judge. They have no application to the issue in this case.

It is true that, among other reasons, the Juvenile Court Rules of 1969 were written in response to *Kent v United States,* 383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966). The study draft of Rule 11, circulated to the committee in January 1968 notes as follows:

"Provision for a finding of probable cause in a waiver proceeding appears in *Green v United States,* 308 F2d

303 (1962) and appeared to be the conclusion of conference and committee discussion. Notice provisions are drawn from requirements of the *Gault* case, *and provisions for the right to counsel, access to social records, and written statements of findings from Kent v U.S.* (1966) 383 U.S. 541."[1] (Emphasis added.)

While this Court cannot enact substantive laws, it does have the authority to decide upon the procedures to be followed in the courts of this state. Such authority has been exercised by adopting the General Court Rules for courts of general jurisdiction, the District Court Rules for the district courts, and the Juvenile Court Rules. Being

---

[1] Justice Fortas' controlling opinion in *Kent* states the grounds raised by counsel as follows (p 551):

"Before the Court of Appeals and in this Court, petitioner's counsel has urged a number of grounds for reversal. He argues that petitioner's detention and interrogation, described above, were unlawful. He contends that the police failed to follow the procedure prescribed by the Juvenile Court Act in that they failed to notify the parents of the child and the Juvenile Court itself, note 1, *supra;* that petitioner was deprived of his liberty for about a week without a determination of probable cause which would have been required in the case of an adult, see note 3, *supra;* that he was interrogated by the police in the absence of counsel or a parent, cf. *Harling v United States,* 111 U.S. App. D.C. 174, 176, 295 F. 2d 161, 163, n. 12 (1961), without warning of his right to remain silent or advice as to his right to counsel, in asserted violation of the Juvenile Court Act and in violation of rights that he would have if he were an adult; and that petitioner was fingerprinted in violation of the asserted intent of the Juvenile Court Act and while unlawfully detained and that the fingerprints were unlawfully used in the District Court proceeding."

The issues considered by the Court are stated as follows (p 552):

"It is to petitioner's arguments as to the infirmity of the proceedings by which the Juvenile Court waived its otherwise exclusive jurisdiction that we address our attention. Petitioner attacks the waiver of jurisdiction on a number of statutory and constitutional grounds. He contends that the waiver is defective because no hearing was held; because no findings were made by the Juvenile Court; because the Juvenile Court stated no reasons for waiver; and because counsel was denied access to the Social Service file which presumably was considered by the Juvenile Court in determining to waive jurisdiction."

From the above, it will be seen that the Policy Memorandum No. 7 of November 30, 1959 of the Juvenile Court was not in issue. See Appendix A, III.

fully cognizant of the problems created by the decisions of the United States Supreme Court in *Kent, supra* and *In re Gault,* 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967), the Probate Court Committee of this Court, of which I was then chairman, undertook with the help of the probate judges, to insure *procedural* due process in the handling of juvenile court cases. Any question pertaining to JCR 1969, 11, is not before the Court in this case since it was not in effect at the time the action of the probate judge herein reviewed took place.

It is perhaps unfortunate that the issue in this case was framed in terms of standards rather than in the more usual terminology used to attack an ambiguous or unclear statute—void because of vagueness or overbreadth. The fundamental question revolves around the concept that ours is a government of laws and not of men. If we have a viable law that can be applied by the probate judges of this state, the decision of the lower courts should be upheld. On the other hand, if the law is so vague that its application is nothing more than a *carte blanche* grant of discretion to each probate judge to exercise his own wisdom and compassion as to what he thinks should be done in each case that comes before him upon a request for waiver, the previous decision of this Court was correct and should be reaffirmed.

Review is an essential part of the judicial process. While a vast majority of cases, both criminal and civil, are decided by a single judge, an all-important element in the decision making process is the ever-present possibility in every case that the decision of a judge will be subjected to appellate review. If that possibility is removed, the judge becomes a monarch from whose ruling—

good, bad or indifferent—there is no recourse. As was said in *Kent, supra* (p 561):

"Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions. It must have before it a statement of the reasons motivating the waiver including, of course, a statement of the relevant facts. It may not 'assume' that there are adequate reasons, nor may it merely assume that 'full investigation' has been made."

Under the statute, the provisions of which I discussed at length in my first opinion, the law leaves it solely up to the judgment of each probate judge to formulate his own criteria. The basis for waiver could be as varied as the number of probate judges. For example, see Appendix A setting forth three possible sets of standards.

The difficulty with the statute has been overcome by the enactment of 1972 PA 265; MCLA 712A.4; MSA 27.3178(598.4).

There remains the question as to whether the decision of this Court should be given retroactive or prospective effect. Volumes have been written on this subject.[2] We are concerned with the consti-

---

[2] *Gelpcke v City of Dubuque,* 68 US (1 Wall) 175; 17 L Ed 520 (1863); *Great Northern R Co v Sunburst Oil & Refining Co,* 287 US 358; 53 S Ct 145; 77 L Ed 360 (1932); *Chicot County Drainage Dist v Baxter State Bank,* 308 US 371; 60 S Ct 317; 84 L Ed 329 (1940); *Linkletter v Walker,* 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965); *Tehan v Shott,* 382 US 406; 86 S Ct 459; 15 L Ed 2d 453 (1966); *Johnson v New Jersey,* 384 US 719; 86 S Ct 1772; 16 L Ed 2d 882 (1966); *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967); *Desist v United States,* 394 US 244; 89 S Ct 1030; 22 L Ed 2d 248 (1969); *Cipriano v City of Houma,* 395 US 701; 89 S Ct 1897; 23 L Ed 2d 647 (1969); *Williams v United States,* 401 US 646; 91 S Ct 1148; 28 L Ed 2d 388 (1971); *Mackey v United States,* 401 US 667; 91 S Ct 1160; 28 L Ed 2d 404 (1971); *United States v United States Coin & Currency,* 401 US 715; 91 S Ct 1041; 28 L Ed 2d 434 (1971); *Chevron Oil Co v Huson,* 404 US 97; 92 S Ct 349; 30 L Ed 2d 296 (1971);
*Phipps v School Dist of Pittsburgh,* 111 F2d 393 (CA 3, 1940); J A *Dougherty's Sons v Commissioner of Internal Revenue,* 121 F2d 700 (CA 3, 1941); *Warring v Colpoys,* 74 US App DC 303; 122 F2d 642

tutionality of a statute in which the decision by a probate-juvenile judge, under the statute, can result in a person, classified as a juvenile, being waived from that classification and treated as an adult in a prosecution for a criminal offense. Some legal scholars adhere to the theory that once such a statute is declared to be unconstitutional, the court must also find that it was void and of no effect from the time of enactment. Others feel that the court finding can be given just prospective effect.

In *O'Callahan v Parker,* 395 US 258; 89 S Ct 1683; 23 L Ed 2d 291 (1969), the United States Supreme Court held that military courts lacked the authority to try a soldier who, while temporarily freed of military responsibility, had been charged with a crime cognizable in a civilian court. The issue of retroactivity of this decision came before the United States Court of Appeals, Fifth Circuit, in *Gosa v Mayden, Warden,* 450 F2d 753 (CA 5, 1971). Judge Clark, writing the majority opinion, said (p 758):

"It has always been the law that proceedings of a court which is without jurisdiction of the subject matter

---

(1941); *McSparran v Weist,* 402 F2d 867 (CA 3, 1968); *Gosa v Mayden, Warden,* 450 F2d 753 (CA 5, 1971); *United States of America ex rel Flemings v Chafee,* 458 F2d 544 (CA 2, 1972); *Missouri Utilities Co v City of California,* 8 F Supp 454 (WD Mo, 1934).

*Bingham v Miller,* 17 Ohio 445 (1848); *Jawish v Morlet,* 86 A2d 96 (Mun Ct App DC, 1952); *Bricker v Sims,* 195 Tenn 361; 259 SW2d 661 (1953); *Haney v Lexington,* 386 SW2d 738 (Ky, 1964); *Bouge v Reed,* 254 Or 418; 459 P2d 869 (1969).

Law Review Articles:

Dunaway, *Limited Retroactivity of Overruling Decisions: A Doctrine of Justice,* 25 Va L Rev 210 (1938);

Spruill, *The Effect of an Overruling Decision,* 18 NC L Rev 199 (1940);

Levy, *Realist Jurisprudence and Prospective Overruling,* 109 U of Pa Law Rev 1 (1960);

*Retroactivity of Criminal Procedure Decisions,* 55 Iowa L Rev 1309 (1970).

are void, but does this inevitably lead to the necessity for full retrospective application of the court decision which first discovers and announces the jurisdictional deficit? We hold it does not."

In analyzing the question as applied to *Gosa,* Judge Clark pointed out (p 759):

"The issue * * * is not whether the accused could be tried at all, but which forum had the right to conduct the proceedings. Not whether, but where."

Judge Clark applied the tests for refusing retro- active application set forth in *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967). Applying the "purpose of the new standard test", he concluded "that *O'Callahan* ultimately decides no more on this subject [jurisdiction] than that there is a belief that a civilian court trial with grand and petit jury protections would tend to prevent arbitrariness and repression and be fairer." Applying the "justified reliance on the old standard test", he noted that the *O'Callahan* deci- sion had not been foreshadowed in other opinions. Applying the "effect on the administration of jus- tice of retroactive application test", he noted that the number of cases which conceivably might be affected and the administrative problems which could arise from them were so considerable as to militate against giving the decision retrospective effect. The United States Supreme Court has granted certiorari (June 19, 1972), 407 US 920; 92 S Ct 2467; 32 L Ed 2d 805 (1972).[3]

In *United States of America ex rel Flemings v Chafee,* 458 F2d 544 (CA 2, 1972), the United States Court of Appeals, Second Circuit, in a case

---

[3] Affirmed, Justices Blackmun, Burger, C. J., White and Powell with Justice Rehnquist concurring in judgment. *Gosa v Mayden,* 413 US 665; 93 S Ct 2926; 37 L Ed 2d 873 (1973).

involving precisely the same issue as in *Gosa,
supra,* reasoned to a contrary result and concluded
that *O'Callahan* must be applied retroactively be-
cause that decision was grounded in the absence of
jurisdiction to adjudicate. Applying a two pronged
test, the Court concluded that, as to the purpose to
be served, the United States Supreme Court's
decision in *O'Callahan* is that court martial proce-
dures employed there raised a "clear danger of
convicting the innocent", and, applying the impact
of the retroactivity test, the Court was unim-
pressed with the claim that the administrative
burden of granting full retroactivity would be
staggering or that there would be a significant
impact on the administration of justice. Certiorari
was granted June 19, 1972 in the above case. 407
US 919; 92 S Ct 2461; 32 L Ed 2d 805 (1972).[4]

We find the reasoning of the Court in *Gosa,
supra,* and in its antecedents going back to the
opinion of Justice Cardozo in *Great Northern R Co
v Sunburst Oil & Refining Co,* 287 US 358, 364–
366; 53 S Ct 145, 148–149; 77 L Ed 360, 366–367
(1932), and the decision in *Griffin v Illinois,* 351
US 12; 76 S Ct 585; 100 L Ed 891 (1956), followed
with approval by this Court in *Parker v Port
Huron Hospital,* 361 Mich 1; 105 NW2d 1 (1960),
to be the more persuasive.

For example, in the present case, even though
the statute was enacted in 1939, it was never
seriously challenged until 1968. Prior to the 1960's
and the decisions in *Kent* and in *In re Gault,
supra,* juvenile courts were considered to be *sui
generis.* This was the situation in Michigan and
throughout the United States. Before January 1,

---

[4] Reversed on other grounds *sub nom Warner v Flemings,* 413 US
665; 93 S Ct 2926; 37 L Ed 2d 873 (1973).

1964 (see Const 1963, art 6, § 19), a probate-juvenile court judge was not even required to be a lawyer. In keeping with the then theory of the juvenile courts, these laymen-judges functioned as heads of a broad social rehabilitative process that not only involved court procedures but medical and dental care, foster home supervision, operation and supervision of detention homes, and school and teaching facilities for the neglected or the delinquent child. The probate-juvenile court judge was the *pater-familias* for such children. Presumably this concept would be followed by the judge in granting waiver of a juvenile. It is scarcely any wonder that the statute went unchallenged. *Kent* and *In re Gault, supra,* abruptly brought the juvenile court into the full stream of the judicial process. As in *Gosa, supra,* the issue here pertains not to whether, but where—in which court is the juvenile to be tried. Both justice and reality will now be served by holding that the decision of this Court in this case be given prospective effect.

We hold that the retroactive effect of this decision is limited to those cases pending prior to October 3, 1972 (the date 1972 PA 265 was signed into law and given immediate effect) in which the issue of waiver was raised before the trial court and properly preserved on appeal. Waivers otherwise granted prior to date of this decision and not contested upon proper preservation of the issue shall not be affected.

We vote to reverse the decisions of the lower courts.

SWAINSON and WILLIAMS, JJ., concurred with T. M. KAVANAGH, C. J.

## APPENDIX A

I. *Standards Used by Judge O'Brien in Making his Decision to Waive.*

"There are three tests that apply there:

"(1) 'Where the nature of the offense which in itself was of such an obviously adult character as to make the juvenile court inappropriate.

"(b) 'Where the court has made use of every available disposition and the minor has been unamenable to treatment.'

"And (c) 'Where the minor whose physical and mental development showed a maturation beyond the calendar age and which made the minor unwilling to accept treatment as a minor.' "

II. *Standards Contained in JCR 1969, 11.*

"In making such determination, the following criteria shall be considered:

"(1) The prior record and character of the child, his physical and mental maturity, and his pattern of living;

"(2) The seriousness of the offense;

"(3) Even though less serious, if the offense is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under the regular statutory juvenile procedures;

"(4) The relative suitability of programs and facilities available to the juvenile and criminal courts for the child;

"(5) Where it is found to be in the best interests of the public welfare and for the protection of the public security, generally, that said juvenile be required to stand trial as an adult offender."

III. *Standards set forth in the Appendix to the Opinion in Kent v United States, 383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966).*

"The determinative factors which will be consid-

ered by the Judge in deciding whether the Juvenile Court's jurisdiction over such offenses will be waived are the following:

"1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

"3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

"4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia.

"6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

"7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have commit-

ted the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court."

LEVIN, J. *(dissenting)*. Andrew B. Fields was charged when he was 16 years old with committing the offenses of breaking and entering and of uttering and publishing. On petition of the prosecuting attorney the probate judge waived jurisdiction to the circuit court.

Fields appealed the orders of waiver to the circuit court claiming that the provision of the Probate Code authorizing a probate judge to waive jurisdiction of a child between the ages of 15 and 17 to a court of general criminal jurisdiction *(i.e.,* the circuit or recorder's court) was unconstitutional because the Legislature had not prescribed standards to guide the judge in making his decision.

This waiver provision (subsequently amended in 1972 to prescribe standards in response to our original decision in this case) then read:

"In any case where a child over the age of 15 years is accused of any act the nature of which constitutes a felony, the judge of probate of the county wherein the offense is alleged to have been committed may, after investigation and examination, including notice to parents if address is known, and upon motion of the prosecuting attorney, waive jurisdiction; whereupon it shall be lawful to try such child in the court having general criminal jurisdiction of such offense." MCLA 712A.4; MSA 27.3178(598.4).

The circuit judge ruled the statute constitutional. The Court of Appeals affirmed. 30 Mich App 390; 186 NW2d 15 (1971). We granted leave and reversed holding the waiver provision unconstitutional because of the failure to prescribe stan-

dards. 388 Mich 66; 199 NW2d 217 (1972). The case is again before us on our grant of the people's motion for rehearing.

The opinion of the Court on the original submission concludes with the following paragraph, which expresses both the holding and reasoning:

"If the Legislature is to treat some persons under the age of 17 differently from the entire class of such persons, excluding them from the beneficient processes and purposes of our juvenile courts, the Legislature must establish suitable and ascertainable standards whereby such persons are to be deemed adults and treated as such subject to the processes and penalties of our criminal law. The statute is unconstitutional because it lacks standards." *People v Fields,* 388 Mich 66, 77; 199 NW2d 217 (1972).[1]

We agree there is need to formalize criteria outlining an ordered structure within which discretionary power may be exercised. Unless criteria are formalized, a lawyer representing a juvenile cannot effectively prepare his case, the judge is

---

[1] Earlier in the opinion the Court, stressing the importance of standards as a safeguard against unjustified discrimination, said:

"Absent carefully defined standards *in the statute itself* which would justify such disparity of treatment, there is *no way* by which it can be determined what standard a probate judge should apply in a waiver proceeding. He might use the standards used by Judge O'Brien. He might use the standard contended for by the prosecutor— 'the child's welfare and the best interest of the state.' This standard is so vague and subject to so many possible interpretations as to be no standard at all. He might formulate his own standard for review by the appellate courts of this state on a case-by-case basis. He might apply the standards set forth in JCR 1969, 11." 388 Mich 75–76 (Emphasis supplied.)

There is, however, a way the controlling standard can be "determined" even though no standard is explicitly stated in the statute itself—the way charted before the original opinion in *Fields:* adoption of a court rule, or the filing of a judicial opinion articulating a rule of law which henceforth controls. Clearly, it overstates the matter to hold that unless a standard is stated in the statute itself there is no way of resolving doubt concerning the standard. See fn 7, *infra,* and accompanying text.

without a guide to assist him in exercising his discretion, and effective appellate review is impeded.

We do not agree that the absence *"in the statute itself* of carefully defined standards," 388 Mich 75 (emphasis supplied) obliges us to hold the waiver provision unconstitutional.

## I

The original opinion proceeds on the assumption that a statute which delegates discretionary power must itself contain standards to guide the exercise of the delegated power. The source of this assumption is unclear; it is perhaps attributable to the manner in which the standards requirement developed.

While the principle of three separate branches of government and of separation of powers is basic, the constitution does not expressly prohibit the Legislature from delegating law-making power.[2]

---

[2] The original statements of the nondelegation doctrine were uncompromising. Mr. Justice COOLEY declared:

"One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed." Cooley's Constitutional Limitations (1st ed), pp 116–117.

This was written in the 1860's considerably before so much governmental business came to be transacted through administrative agencies. The need to accommodate both the principle of separation of powers and the nondelegation doctrine to the realities of the administrative process required a retreat from such sweeping statements.

In an oft-quoted opinion, Mr. Justice Rosenberry of the Wisconsin Supreme Court observed in 1928:

"The essential facts upon which courts, legislatures and executives, as well as students of the law, agree is that there is an overpowering necessity for a modification of the doctrine of separation and nondelegation of powers of government. In the face of that necessity courts have upheld laws granting legislative powers under the guise of the power to make rules and regulations, have upheld laws delegat-

Indeed, despite the constant iteration of the non-delegation doctrine, governmental officials, administrative agencies and other authorities, including the courts, daily make and remake, apply and fail to apply rules which they, earlier or ad hoc, themselves establish that have "the effect of law".[3] Those rules and regulations are often the only law that counts—the law that governs disposition of the case at hand.

The Administrative Code of this state, including the periodic supplements, takes half a shelf. The Code of Federal Regulations requires a stack of shelves. The restraints and directives there embodied are no less binding because they are called rules and regulations, and are not "laws".

"The non-delegation doctrine is almost a complete failure. It has not prevented the delegation of legislative power." Davis, Administrative Law Treatise, 1970 Supplement, § 2.00, p 40.

"Delegation of 'lawmaking' power is the dynamo of modern government." Jaffee, Judicial Control of Administrative Action, p 33 (1965).

"[P]rinciples of non-delegability of legislative and judicial powers are no longer useful tools to the state

---

ing judicial power under the guise of power to find facts. As Mr. [Elihu] Root said:

"'The old doctrine prohibiting the delegation of legislative power has virtually retired from the field and given up the fight. * * *'

"The public interest would be greatly advanced and our law clarified if the situation as it exists were frankly recognized and an attempt made by all departments of the government to guard against the dangers foreseen by Montesquieu and apprehended by every thoughtful student of the subject." *State ex rel Wisconsin Inspection Bureau v Whitman,* 196 Wis 472, 498; 220 NW 929 (1928).

[3] *See Public Utilities Commission of California v United States,* 355 US 534; 78 S Ct 446; 2 L Ed 2d 470 (1958); *Maryland Casualty Co v United States,* 251 US 342, 349; 40 S Ct 155; 64 L Ed 2d 297 (1920); 2 Am Jur 2d, Administrative Law, § 292, p 119; 8 Callaghan, Michigan Pleading and Practice (2d ed), § 60.20, p 130; *Sterling Secret Service, Inc, v Department of State Police,* 20 Mich App 502, 508; 174 NW2d 298 (1969).

courts in their task of finding a workable method of imposing sound and proper limits on the exercise of discretionary powers by state agencies." 1 Cooper, State Administrative Law, p 53 (1965).

When this was perceived, the courts, confronted with the necessity and the reality of widespread delegation of law-making power—there being no way in which a Legislature can anticipate or superintend the myriad situations which arise in governing—developed the standards requirement as part of the effort to guard against arbitrary exercise of discretion.[4]

Courts are ever wary of the dangers inherent in the excessive lodgment of delegated power. Faced with the expanding discretionary power of governmental officials and agencies, the judiciary sought to place restraints on the exercise of delegated power. The judges writing at the time thought it persuasive to justify their restrictions on agency power as measures designed to preserve legislative power—rather than to control it—and, specifically, to explain the standards requirement as an elaboration of another judicially-created doctrine, the nondelegation doctrine.

Logically, if the purpose of the standards requirement was preservation of legislative power, the Legislature must itself prescribe the standards.

---

[4] *Yick Wo v Hopkins,* 118 US 356, 366–367; 6 S Ct 1064; 30 L Ed 220 (1886), appears to be one of the early statements of the desirability of "guidance" regarding the exercise of discretionary power. The Court said that the delegated licensing power was "not confided to their [the licensing board's] discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary and acknowledges neither guidance nor restraint."

The only case cited in Corpus Juris (12 CJ, Constitutional Law, § 329, n 54), published in 1917, for the proposition that standards should be stated is the decision of a *nisi prius* court in *Lee v O'Malley,* 69 Misc 215; 126 NYS 775, 780 (1910), *rev'd on other grounds,* 140 App Div 595; 125 NYS 772 (1910), which in turn relied on *Yick Wo v Hopkins, supra.*

The source of the standards requirement was not, however, an abstract concern with delegation of law-making power. It was rather the need to curb delegations made without adequate safeguards protecting against misuse of discretionary decision-making power. The nondelegation doctrine was just one of the handles, like procedural due process and judicial review, the courts grasped to restrain the agencies.

## II

Just as the nondelegation doctrine as an absolute limitation on the power of the Legislature to delegate law-making power failed to prevent the delegation in fact of discretionary law-making power, so, too, the standards requirement has failed effectively to control either the delegation of discretionary law-making power or agency exercise of discretion.

The courts have sustained delegations of law-making power although no standard has been expressed or under standards so general they provide no meaningful protection against the hazards lurking in delegated law-making power.

It clearly appears, upon examining one encyclopedia, that the standards "requirement" is a goal or test and not truly a requirement invariably enforced. While it is there stated that "the legislative authority must declare the policy or purpose of the law and, as a general rule, must also fix the legal principles which are to control in given cases by setting up standards or guides to indicate the extent, and prescribe the limits, of the discretion which may be exercised" (1 Am Jur 2d, Administrative Law, § 113, pp 913–914), a few pages later it is acknowledged:

"[H]oldings of particular cases may range from a decision that the general rule is inapplicable because of the nature of the power involved, or the nature of the right involved, or that no specific standard is required because of the impracticability of providing one, or the public necessity of vesting the discretion conferred, or because only a privilege and not a property right is involved." 1 Am Jur 2d, Administrative Law, § 115, p 918.

The text swings back, and this goes to the heart of the dispositive issue, to state that the standard governing the authority and discretion "must be found in the law itself, since only the legislature can create such standards and limits". 1 Am Jur 2d, Administrative Law, § 116, p 919.

But the very next sentence states with equal absoluteness, in language this Court quoted with approval in *Pleasant Ridge v Governor,* 382 Mich 225, 247; 169 NW2d 625 (1969), in rejecting the contention "that necessary standards must be set up in the act by which an administrative tribunal is appointed and directed to act":

*"The standard which is to guide the discretion of administrative agencies need not in all instances be expressly stated in the statute or ordinance.* It is not always necessary to prescribe a specific rule of action to govern the exercise of powers conferred, particularly where a standard is implied in the statute or ordinance conferring the power. The standard to guide a particular act which in terms is not limited by any specific standard may be found within the framework of the statute under which the act is to be performed, or may inhere in its subject matter or purpose, and a clearly defined field of action may implicitly contain the criteria which must govern the action. Also, a standard may be found in other pertinent legislation, or in executive order, or in the field of law governing the operation of the agency." 1 Am Jur 2d, Administrative Law, § 116, pp 919–920. (Emphasis supplied.)

Professor Frank Cooper in his treatise on State Administrative Law stated:

"It has been recognized [by the courts] that loose and imprecise standards—referable to such elusive concepts as 'adequacy' of a service, or 'appropriateness' of a bargaining unit, or other criteria not susceptible of proof or disproof by objective tests—are valid whenever it is impracticable to lay down more precise controls. * * *

"Judicial retreat from the 'standards' test may be seen, further, in opinions proclaiming that 'the exigencies of modern government have increasingly dictated the use of general, rather than minutely detailed standards'; in cases holding that the perceived purpose of the statute supplies a standard, even though none is enunciated; and in decisions where the court itself supplied a standard by interpolation, in order to sustain a delegation." 1 Cooper, State Administrative Law, p 62.

Cooper, surveying the cases, summed up that, while the idea of a standards test is "logical and sound", "it does not provide a practical working tool because there is no logical basis for determining how far the nature of the case permits or prohibits the fashioning of a specific standard". 1 Cooper, Administrative Law, p 71.

### III

Without denigrating the desirability of standards, today the emphasis is on the necessity for delegation, the character of the official or authority exercising delegated power, the totality of the protections ("safeguards") provided against governmental action under delegated power.

Professor Kenneth Culp Davis writes:

"The non-delegation doctrine can and should be al-

tered to turn it into an effective and useful judicial tool. Its purpose should no longer be either to prevent delegation of legislative power or to require meaningful statutory standards; its purpose should be the much deeper one of protecting against unnecessary and uncontrolled discretionary power. *The focus should no longer be exclusively on standards; it should be on the totality of protection against arbitrariness, including both safeguards and standards. The key should no longer be statutory words; it should be the protections the administrators in fact provide, irrespective of what the statutes say or fail to say.*" Davis, Administrative Law Treatise (1970 Supp), § 2.00, pp 40–41. (Emphasis supplied.)

The need to transform the failing standards requirement into a more effective safeguard against discriminatory exercise of delegated discretionary power has been judicially acknowledged:

"It is now apparent that the requirement of expressed standards has, in most instances, been little more than a judicial fetish for legislative language, the recitation of which provides no additional safeguards to persons affected by the exercise of the delegated authority. * * *

"As pointed out in Davis on Administrative Law, the important consideration is not whether the statute delegating the power expresses *standards,* but whether the procedure established for the exercise of the power furnishes adequate *safeguards* to those who are affected by the administrative action." (Emphasis by the Court.) *Warren v Marion County,* 222 Or 307, 314; 353 P2d 257, 261 (1960).

Similarly, see *Butler v United Cerebral Palsy of Northern Kentucky, Inc,* 352 SW2d 203 (Ky App, 1961); *Elk Run Telephone Co v General Telephone Co of Iowa,* 160 NW2d 311 (Iowa, 1968); *Esso Standard Oil Co v Holderman,* 75 NJ Super 455;

183 A2d 454 (1962), *aff'd* 39 NJ 355; 188 A2d 599 (1963).

Davis maintains that because the Legislature often is unable or unwilling to supply meaningful standards a judicial requirement of statutory standards is often impractical. Yet with the right kind of judicial prodding administrators can be expected to produce them:

"Legislative bodies should clarify their purposes to the extent they are able and willing to do so, but when they choose to delegate without standards, the courts should uphold the delegation whenever the needed standards to guide particular determinations have been supplied through administrative rules or policy statement." Davis, Administrative Law Treatise (1970 Supp), § 2.00–5, p 57.

A recognition that much of the law is created by those who administer it, coupled with a requirement that administrators (judicial as well as non-judicial) articulate in reasoned statements (rule making) and opinions the bases of their determinations, will provide more effective protections against arbitrary and discriminatory exercise of discretionary power than ritualistic incantations by the decision-maker that he has "carefully considered" the statutory criteria (which he may then enumerate) and has reached one conclusion or another, without any explanation of the process by which he reached that result.

Now that it is clear both that the Legislature must be allowed to delegate law-making power and that delegations may be sustained although unaccompanied by standards, or under statements of purported standards so general that they do not confine but, rather, stretch the discretion exercisable to the outer limits of reasonable, and, therefore, of constitutional exercise of power,—now that

it is recognized that the purpose is the "deeper one of protecting against unnecessary and uncontrolled discretionary power", and that the focus should be "on the totality of protections against arbitrariness, including both safeguards and standards", it would be stultifying to insist that the absence of standards in the statute itself is necessarily fatal.

## IV

Recognizing the difficulty in formulating any "true test" for determining whether a particular delegation will be sustained, that courts ultimately make a pragmatic analysis of whether the consequences of the delegation are so undesirable as to require judicial intervention, and that it is not possible to articulate or enumerate all the factors that appear to motivate decision, Professor Cooper identified a number of factors which appear to favor sustaining a particular delegation of power.

He wrote: "If a seemingly vague standard is susceptible of definition by reference to well-established legal concepts, it will usually be sustained." Similarly, in areas where the delegation of broad discretionary powers is supported "by long tradition," delegations cast in terms that leave wide discretion are often upheld. 1 Cooper, State Administrative Law, pp 74–76. He added that where judicial review is available to correct abuses, especially where the scope of review is not unduly limited, delegations of broad discretionary power have been sustained. 1 Cooper, State Administrative Law, p 81. There are still other factors which favor sustaining a particular delegation but they need not presently be considered as the factors already mentioned plainly support the delegation here.

## V

The Michigan statutory provision authorizing a probate judge to waive juvenile court jurisdiction to a court of general criminal jurisdiction was first enacted 50 years ago, and has been carried forward to the present without pertinent substantive change.[5]

During the years that intervened before this case arose, many requests for waiver of jurisdiction were considered by the probate judges of this state. Out of their decisions criteria developed for the exercise of this power. Those criteria, like the rules of the common law, were handed down from one judge to another. In this manner the criteria so developed came to be law. This is the process by which the common law (and indeed a great amount of statutory law, so much of which is assimilative of the common law) was formed.

An order waiving juvenile jurisdiction was and, after the 1970 amendments governing appeals of orders of the probate court, continues to be appealable as of right to the circuit court. MCLA 712A.22; MSA 27.3178(598.22). Even before trial, the Court of Appeals and this Court may grant leave to appeal a decision of the reviewing circuit court—as was done in this very case—if it appears that further appellate review is justified.

---

[5] The originally enacted provision read:

"*[P]rovided, however,* That in any case where a child over the age of fifteen years is charged with a felony, the judge of probate may, after investigation and examination, and upon motion of the prosecuting attorney, waive jurisdiction; whereupon it shall be lawful to try such child in the court having general criminal jurisdiction of such offense." 1923 PA 105, § 6; 1929 CL 12839.

*See, also,* 1939 PA 288, ch XII, § 26, p 670; 1944 PA (1st Ex Sess) 54, p 118; 1948 CL 712A.4; 1970 CL 712A.4.

*Similarly, see* 1927 PA 175, ch IV, § 27; 1929 CL 17161; 1948 CL 764.27; 1970 CL 764.27.

VI

In *Kent v Dulles,* 357 US 116; 78 S Ct 1113; 2 L
Ed 2d 1204 (1958), the United States Supreme
Court, while stating that the discretionary power
delegated to the Secretary of State to grant and
issue passports must be guided by adequate stan-
dards, permitted the delegation although a stan-
dard was not stated in the statute itself. The Court
reached this result by treating as the standard an
*administrative* policy of refusing to issue a pass-
port only if there was a question concerning the
applicant's citizenship or allegiance to the United
States or if the applicant was participating in
criminal or unlawful conduct.[6]

This precedent aptly fits the case before us. Over
45 years of judicial experience in the application of
the waiver of juvenile jurisdiction provision pre-
ceded the waiver decision in this case. That experi-
ence and the precedents that evolved, together
with the precedents of other jurisdictions (see part
VII) and commentary in scholarly articles[7] was the

[6] The Court said that it would not "readily infer that Congress gave
the Secretary of State unbridled discretion to grant or withhold" the
issuance of a passport.

Later, in *Kent v United States,* 383 US 541, 553; 86 S Ct 1045; 16 L
Ed 2d 84 (1966), the United States Supreme Court repeated this
theme in discussing the District of Columbia waiver of juvenile
jurisdiction provision:

"The statute gives the Juvenile Court a substantial degree of
discretion as to the factual considerations to be evaluated, the weight
to be given them and the conclusion to be reached. It does not confer
upon the Juvenile Court a license for arbitrary procedure."

[7] "The relevant factors are age, previous record, the nature of the
crime, and the sophistication of the criminal method employed".
Note, *Juvenile Delinquents: The Police, State Courts, and Individual-
ized Justice,* 79 Harv L Rev 775, 793 (1966).

Another writer concluded that in most states this discretion "is
entirely unconfined by statutory standards", and that the test "gener-
ally adopted is the vague one of 'hopelessness.' Essentially, the judge
must be convinced that the youth cannot be restrained and rehabili-
tated within the juvenile facilities, and that he is therefore a danger
to the public welfare." All judges seem to agree on "certain basic

basis upon which Michigan Deputy Court Adminis-
trator William Downs suggested in 1961 the stan-
dards which the probate court judge relied on in
this case.

There is no need again to set out at full length
the judge's statement as it appears in the original
opinion, 388 Mich 68–71. Suffice it to say that the
judge followed the criteria suggested by Mr.
Downs:[8]

"The next question is whether or not the Court
should retain jurisdiction or whether or not it should
waive the jurisdiction to a higher court.

"The basis upon which this is done is contained in
Downs, Michigan Juvenile Court: Law and Practice.

"The ultimate question is not solely whether the
juvenile may be rehabilitated through the facilities of
the Juvenile Court. And the Court, of course, does have

---

criteria of transfer: criminal maturity and danger to the public";
"[r]esponsiveness to prior treatment is perhaps the most significant
indicator"; "[a] number of other considerations, varying in signifi-
cance, may be mentioned. Family background may be of direct
relevance in the decision to transfer * * * . Finally, the youth's
attitude toward his crimes is invariably considered." Note, *Rights and
Rehabilitation in the Juvenile Courts,* 67 Colum L Rev 281, 313, 315–
316 (1967).

A survey conducted by the Advisory Council of Judges, National
Council of Crime and Delinquency, concludes that the criteria to be
considered are: "(1) the prior record and character of the minor, his
physical and mental maturity, and his pattern of living; (2) the type
of offense—whether it demonstrated viciousness or involved force or
violence; and (3) the comparable adequacy and suitability of facilities
available to the juvenile and criminal courts". Transfer of Cases
Between Juvenile and Criminal Courts, a Policy Statement, 8 Crime
& Delinquency 1, 7 (1962).

The diversity of approach does underscore the need for an authori-
tative statement of the controlling criteria. But the failure of the
Legislature to indicate its choice does not leave the matter at large
any more so than when the Legislature passes an ambiguous statute.
That is when the court's work begins.

[8] The book referred to by the juvenile court judge was published in
1963 by the Institute of Continuing Legal Education; *see* § 12.7, p 424.

Reviewing the criteria applied in other jurisdictions, Mr. Downs
suggested in his 1961 pamphlet issued by our Court Administrator
the criteria quoted in the 1963 book. Downs, Commentary on the
Michigan Juvenile Code (Office of Court Administrator, 1961), p 13.

the responsibility to determine whether everything that could be done for the individual in the Juvenile Court has been done. Also, whether or not the particular individual is so mature that the facilities of the Juvenile Court cannot aid, and their cases must be referred to criminal courts.

"There are three tests that apply there:

"(1) 'Where the nature of the offense which in itself was of such an obviously adult character as to make the juvenile court inappropriate.'

"(b) 'Where the court has made use of every available disposition and the minor has been unamenable to treatment.'

"And (c) 'Where the minor whose physical and mental development showed a maturation beyond the calendar age and which made the minor unwilling to accept treatment as a minor.' "

It is apparent that even before the formal adoption of Juvenile Court Rule 11 as part of the Juvenile Court Rules of 1969,[9] there had come to

---

[9] Juvenile Court Rule 11.1 (effective March 1, 1969) reads as follows:

"RULE 11. WAIVER OF JURISDICTION

".1 *Hearing; Quantum of Proof; Criteria for Waiver.* Where a petition is filed requesting a waiver of jurisdiction under the provisions of section 4 of Act 54 of the First Extra Session of 1944, as amended, the hearing shall consist of two phases. Duration of an interval of time, if any, shall be discretionary with the court:

"(a) *Phase 1: Showing of Probable Cause:* The court shall first determine if there is probable cause to believe that the child has committed an offense which, if committed by an adult, would be a felony.

"(b) *Phase 2: Criteria for Waiver:* Upon a showing of probable cause, the court shall proceed to conduct a full investigation to determine whether or not the interests of the child and the public would best be served by granting a waiver of jurisdiction to the criminal court.

"In making such determination, the following criteria shall be considered:

"(1) The prior record and character of the child, his physical and mental maturity, and his pattern of living;

"(2) The seriousness of the offense;

"(3) Even though less serious, if the offense is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under the regular statutory juvenile procedures;

be recognized in Michigan, as in other jurisdictions
(see part VII), criteria for the exercise of the
waiver power.

Both Juvenile Court Rule 11 and the 1972 legis-
lative modification of the waiver of juvenile juris-
diction provision (see fn 9), state as the fundamen-
tal consideration the general criterion (repetitious
of the long-ago enacted purpose clause of the
Probate Code Chapter concerning juveniles; see fn
12) "whether or not the interests of the child and
the public would best be served by granting a
waiver of jurisdiction to the criminal court", and
then proceed to enunciate more specific criteria
not fundamentally different from the criteria sug-
gested by Mr. Downs and followed by the probate
judge in this case.

There was and is no need to declare the waiver
of juvenile jurisdiction provision unconstitutional.
This Court has ample power, which it has exer-
cised both decisionally and through rule making
on countless occasions, to provide adequate stan-
dards to guide judges in reaching their decisions,
and to make both the hearing process and appel-
late review meaningful.

The judiciary of this state in establishing waiver
criteria both before and after the decision in *Kent
v United States,* 383 US 541; 86 S Ct 1045; 16 L Ed
2d 84 (1966), did precisely what judges have been
doing for centuries—filling in gaps in a statute.
Especially where power has been delegated to a

"(4) The relative suitability of programs and facilities available to
the juvenile and criminal courts for the child;

"(5) Where it is found to be in the best interests of the public
welfare and for the protection of the public security, generally, that
said juvenile be required to stand trial as an adult offender."

Following our original decision in this case, the waiver of juvenile
jurisdiction provision quoted in the opening paragraphs of this opin-
ion was amended to add almost verbatim the text of Juvenile Court
Rule 11. *See* 1972 PA 265.

court, it can frequently find the "intelligible principle"[10] in its own jurisprudence and in the decisions of other courts dealing with like problems.

## VII

In *Mikulovsky v State,* 54 Wis 2d 699, 705; 196 NW2d 748, 751 (1972), the juvenile court judge had analyzed the testimony at the waiver hearing in light of the criteria for waiver quoted in an appendix to *Kent v United States, supra.* [11] The Wiscon-

[10] *J W Hampton, Jr, & Co v United States,* 276 US 394, 409; 48 S Ct 348, 352; 72 L Ed 624, 630 (1928).

[11] Although the United States Supreme Court acknowledged that the District of Columbia Juvenile Court Act "does not state standards to govern the juvenile court's decision as to waiver" *(Kent v United States, supra,* p 547), the absence of standards in the act itself was not a focal point of the opinion.

The Supreme Court added as an appendix to the *Kent* opinion a policy memorandum, prepared by the judge of the Juvenile Court of the District of Columbia, which read in part as follows:

"The statute sets forth no specific standards for the exercise of this important discretionary act, but leaves the formulation of such criteria to the [Juvenile] Judge. * * *

"An offense falling within the statutory limitations (set forth above) will be waived if it has prosecutive merit and if it is heinous or of an aggravated character, or—even though less serious—if it represents a pattern of repeated offenses which indicate that the juvenile may be beyond rehabilitation under Juvenile Court procedures, or if the public needs the protection afforded by such action.

"The determinative factors which will be considered * * * are the following:

"1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

"3. Whether the alleged offense was against persons or against property, * * * .

"4. The prosecutive merit of the complaint, * * * .

"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults * * * .

"6. The sophistication and maturity of the juvenile * * * .

"7. The record and previous history of the juvenile * * * .

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation * * * by the use of * * * facilities * * * available to the Juvenile Court."

sin statute permits a juvenile court judge to waive jurisdiction if he "deems it contrary to the best interest of such child or of the public to hear the case".[12] In upholding the waiver, the Wisconsin Supreme Court stated that although the United States Supreme Court in *Kent* had not expressly adopted the criteria added as an appendix to its opinion, "the fact that they are appendixed to the court's opinion suggests their appropriateness as guidelines for juvenile court waiver proceedings".

In *State v Gibbs,* 94 Idaho 908, 916; 500 P2d 209, 217 (1972), the Idaho Supreme Court, confronted

---

[12] In *Lewis v State,* 86 Nev 889, 893; 478 P2d 168, 171 (1970), the Nevada Supreme Court, following the lead of the Supreme Court of New Mexico in *State v Doyal,* 59 NM 454, 461; 286 P2d 306, 311 (1955), relied on the statement of general purpose in its juvenile court statute to reject a challenge to the statute premised on the claim that no standards had been prescribed: "We feel that the necessary standards are set out in the general purpose clause of the Juvenile Court Act." The Nevada general purpose clause is substantively identical to the Michigan general purpose clause:

"This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, preferably in his own home, as will be conducive to the child's welfare and the best interest of the state". Michigan's citation is MCLA 712A.1; MSA 27.3178(598.1). Nevada's citation is NRS 62.290.

The *Lewis* and *Doyal* cases were preceded by *Briggs v United States,* 96 US App DC 392, 394; 226 F2d 350, 352 (1955). There, the statute very much like ours, simply provided: "The judge may, after full investigation, waive jurisdiction." The Court analogized to the lack of formalized criteria for the exercise of the sentencing power and stated that a person accused under a criminal statute "does not know with precision the liability to which he will be subjected". Two accused persons, both convicted of the same or similar offenses, may be treated differently; one sentenced to an extended prison term and the other sent home on probation. This, said the Court, "is the essence of modern penology. There are no precisely formulated criteria for the difference in results. It is an imponderable, a true exercise of judgment."

In *People v Shipp,* 59 Cal 2d 845, 852–853; 382 P2d 577, 581–582; 31 Cal Rptr 457, 461–462 (1963), the California Supreme Court ruled that even though its statute contained "no express standards, the trial judge must exercise his discretion reasonably and in furtherance of justice", and that he was impliedly required to exercise his discretion "to serve the purposes of the Juvenile Court Law".

with a challenge similar to the one advanced here, molded the criteria on the basis of decisions in other jurisdictions:

"[T]he state courts, when the discretionary waiver statutes of their respective jurisdictions are subjected to constitutional challenge, must fashion the controlling criteria."[13]

In *Knott v Langlois,* 102 RI 517, 523; 231 A2d 767, 770 (1967), the Rhode Island Supreme Court established standards through rule making.

## VIII

The Idaho Supreme Court in the *Gibbs* case, both by its own careful review of the record—it set aside the waiver because of the inadequacy of the "investigation" in light of the newly promulgated criteria—and by its reference to pertinent language of the United States Supreme Court in *Kent,* emphasized the importance of judicial review and the need for a supportive record and for specific, not *pro forma,* fact-finding as safeguards against haphazard or arbitrary decision making.

The passage quoted by the Idaho Court from *Kent* is as follows:

" 'Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions. It must have before it a statement of the

---

[13] "Jurisdiction ordinarily is waived when (1) the defendant has acquired such a degree of emotional or mental maturity that he is not receptive to rehabilitative programs designed for children; (2) although the defendant is immature, his disturbance has eluded exhaustive prior efforts at correction through existing juvenile programs; or (3) the defendant is immature and might be treated, but the nature of his difficulty is likely to render him dangerous to the public, if released at age twenty-one, or to disrupt the rehabilitation of other children in the program prior to his release." *State v Gibbs,* 94 Idaho 908, 916; 500 P2d 209, 217 (1972).

reasons motivating the waiver including, of course, a statement of relevant facts.' " *Kent v United States, supra,* p 561.

Similarly, in *Knott v Langlois, supra,* the Rhode Island Supreme Court was not willing to *assume* that the juvenile court judge had waived jurisdiction based upon record evidence which *might* have supported a waiver:

"The trial justice * * * used stereotyped language which does not identify with Knott the offense with which he was charged or its prosecutive merit, his prior record, his potential danger to the community, and the possibility of a reasonable rehabilitation. His decision recites only that ' * * * taking into consideration this boy's interest and also the interest of society, it would appear to this Court at this point that the interest of justice might be better served if this Court waived jurisdiction on this particular offense * * * .'

"These are conclusional, rather than factual, generalities which leave open for 'assumption' the reasons which induced the ultimate determination to waive, and consign to speculation whether the required 'full investigation' preceded the decision."

Our relatively new Juvenile Court Rule 11.6 provides for fact-finding: "If a waiver order is issued such order shall be accompanied by or include a written statement of the court setting forth findings forming the basis for entry of the order."

We have thus aligned ourselves with the position of the United States Supreme Court as expressed in *Kent,*[14] and with the Supreme Courts of Idaho and Rhode Island, concerning the need for fact-finding of "sufficient specificity to permit

---

[14] The decision in *Kent v United States, supra,* was not placed on constitutional grounds, but rather was reached in the exercise of the Court's supervisory power over a Federal court.

meaningful review". *Kent v United States, supra,*
p 561.

"To play fair, a trial judge relying upon discretionary
power should place on record the circumstances and
factors that were crucial to his determination. He
should spell out his reasons as well as he can so that
counsel and the reviewing court will know and be in a
position to evaluate the soundness of his decision."
Rosenberg, *Judicial Discretion of the Trial Court,
Viewed from Above,* 22 Syracuse L Rev 635, 665–666
(1971).

Although this rule requiring fact-finding had not
been adopted when jurisdiction was waived in this
case, an examination of the judge's statement of
reasons makes it apparent that this requirement
was satisfied. Whether he reached the right con-
clusion in waiving jurisdiction of Fields need not
now be considered, as the sole issue presented on
appeal to the circuit court, the Court of Appeals
and our Court concerns the constitutionality of the
statute.

## IX

While the courts have refused to allow Legisla-
tures to impose nonjudicial functions on them,[15]
there is little support for the proposition that a
legislative act which confers power on a *court* is
constitutionally deficient because it lacks stan-
dards to guide the court in discharging its judicial
duty. The standards test is a judicial safeguard
against the action of administrative officials and
agencies, not against judicial action.

Discretion conferred "in the legal sense of that
term" *(Yick Wo v Hopkins,* 118 US 356, 366; 6 S

---

[15] *See Local 170, TWU v Genesee Circuit Judge,* 322 Mich 332, 346–
347; 34 NW2d 71 (1948).

Ct 1064; 30 L Ed 220 [1886] [see fn 4]) is discretion guided by a standard that represents the very antithesis of arbitrary power.

This Court has upheld a statute which authorized the disconnection of land from cities or villages although a circuit judge might "in his discretion" deny the disconnecting petition if because of sewer, sidewalks, or other public improvements it would be "inequitable" to grant the petition. *Tribbett v Village of Marcellus,* 294 Mich 607, 615; 293 NW 872 (1940).

More recently this Court upheld an amendment to a garnishment statute authorizing the court to discontinue "for good cause shown" the proceedings against the garnishee:

"Judicial discretion upon good cause shown is a standard in itself sufficient to satisfy all constitutional requirements. The power given to a court under the Constitution is judicial power. * * *

"By their very nature courts are compelled to use their discretion upon good cause shown to protect the rights of parties and prevent injustices." *Johnson v Kramer Bros Freight Lines, Inc,* 357 Mich 254, 257–258; 98 NW2d 586 (1959).

Similarly, in *United States v Baker,* 429 F2d 1344, 1347 (CA 7, 1970), a United States Court of Appeals rejected a contention that the Federal Probation Act and the Federal Youth Corrections Act were unconstitutional because the statutory standards were so vague that the district court's exercise of the delegated power was not subject to meaningful review:

*"Even greater latitude must be recognized where Congress grants broad discretionary powers to courts, for the constitutional and functional role of courts necessarily requires the frequent application of judg-*

*ment in the exercise of discretion.* As Judge Learned Hand observed:

" 'Not infrequently a legislature means to leave to the judges the appraisal of some of the values at stake * * * . They require of the judges the compromise that they think in accord with the general purposes of the measure as the community would understand it. We are of course aware of the resulting uncertainties involved in such an interpretation; but the alternative would be specifically to provide for each situation that can arise, a substitute utterly impractical in operation.' " (Emphasis supplied.)

We have not rested the argument of this opinion on the narrow ground that a distinction should be drawn between delegations of power to a court and delegations to other governmental officers and agencies as we are of the opinion that whether the delegation be to an officer, agency or court, an act of the Legislature is not necessarily unconstitutional because it delegates power without standards; and because we agree with the tendency of the originally filed opinion that it is desirable for appellate courts to formalize criteria for the exercise of trial judge discretion as they have required in the case of agency discretion.

## X

There are a large number of statutory provisions delegating discretionary power to judges without any express standard to guide its exercise. If we hold that a statute conferring on a judge discretionary power is necessarily invalid if guiding standards are not contained in the statute itself, it would necessarily foreshadow holding unconstitutional important provisions of the Code of Criminal Procedure.[16] Large segments of other statutes,

---

[16] As the question before us is one of criminal procedure, we turned

*e.g.,* the Revised Judicature Act and the Probate Code, would similarly fall.

---

to the Code of Criminal Procedure for illustrations. The illustrations could be multiplied by reference to the Revised Judicature Act, the Probate Code, and countless other enactments.

Under the Code of Criminal Procedure, 1927 PA 175; MCLA chs 760–776; MSA ch 287, the Legislature has conferred, without any standards whatsoever to guide their exercise, the following powers on judges or courts to be exercised in the judge's or the court's "discretion":

(a) Whether to remand for preliminary examination after a defendant, not then represented by counsel, waives examination. MCLA 767.42; MSA 28.982.

(b) Whether two or more defendants, jointly indicted, shall be tried separately or jointly. MCLA 768.5; MSA 28.1028.

(c) Whether a sentence imposed for prison escape shall commence forthwith or upon termination of the term or terms the offender is serving. MCLA 768.7a; MSA 28.1030(1).

(d) Whether members of a jury, after they are sworn and before the cause is submitted, shall be kept together or permitted to separate. MCLA 768.16; MSA 28.1039.

(e) Whether to exclude evidence of alibi or insanity if the defendant fails to file a notice of such a defense. MCLA 768.21; MSA 28.1044.

(f) Whether to allow leading questions. MCLA 768.24; MSA 28.1047.

(g) Whether persons informed against as recidivists shall be sentenced to serve a term of up to 1-1/2 times the longest term prescribed in the case of a second conviction (MCLA 769.10; MSA 28.1082), of up to twice the longest term in the case of a third conviction (MCLA 769.11; MSA 28.1083), of up to life imprisonment in the case of a fourth conviction (MCLA 769.12; MSA 28.1084) or, rather, placed on probation.

(h) Where a crime is committed by a person confined in a penal institution, the preliminary examination may be held in the institution at the "option" of the magistrate. MCLA 768.7; MSA 28.1030.

Other provisions conferring discretionary power without standards, that, like the waiver of juvenile jurisdiction provision, do not mention the word "discretion", are the following:

(a) The court may with the consent of a youth who commits a criminal offense between his 17th and 20th birthdays elect to consider and assign such youth to the status of a youthful trainee under the Holmes Youthful Trainee Act. MCLA 762.11; MSA 28.853(11).

(b) Names of additional witnesses may be added to an information before or during the trial (MCLA 767.4; MSA 28.980) and additional alibi or insanity defense witnesses may be added (MCLA 768.20; MSA 28.1043), in both cases "by leave of court and upon such conditions as the court shall determine".

(c) The court may at any time before, during or after trial amend the indictment. MCLA 767.76; MSA 28.1016.

(d) A judge may grant a commission to examine material out-of-state witnesses. MCLA 767.77; MSA 28.1017.

Especially pertinent is the Holmes Youthful Trainee Act which permits a court to "elect" to consider and assign to the status of a youthful trainee a youth who commits a criminal offense between his 17th and 20th birthdays or a youth waived to the court by the juvenile court. MCLA 762.11, 762.15; MSA 28.853(11), 28.853(15). Many persons, by reason of the Holmes Act and the exercise of trial judge discretion,[17] have avoided criminal prosecution. If the Holmes Act were held to be unconstitutional because express standards are not stated, this beneficial diversion from the formal criminal process might come to an end.

The Legislature might not respond to a decision declaring the Holmes Act unconstitutional. If it were to add standards, little would be added to what is already known and we could ourselves attend to. We know the likely standards: consider the nature of the offense, the history of the offender, the likelihood of his responding favorably, and the like, standards very much like the criteria, now formalized in the court rule and statute, developed by probate judges for deciding whether

(e) On order of a judge, a defendant may have witnesses examined before a trial in his behalf "conditionally". MCLA 767.79; MSA 28.1019.

(f) Courts are empowered to pronounce sentences of probation, fine or imprisonment, the only limitation being that the sentence cannot exceed the penalty prescribed by law. MCLA 769.1, 769.8; MSA 28.1072, 28.1080.

(g) A person sentenced to life or any term of years may not be paroled under the lifer law (i.e., after ten years or more of the sentence has been served) if the sentencing judge files written objections. MCLA 791.234; MSA 28.2304.

(h) Special parole (i.e., release before service of the minimum term less good time) may only be granted with the "approval" of the sentencing judge. MCLA 791.233; MSA 28.2303.

[17] The Court of Appeals has indicated that the decision whether a youth shall be tried in a criminal court or given the status of a youthful trainee will be made in the exercise of the trial judge's discretion. *People v Bandy,* 35 Mich App 53, 58; 192 NW2d 115 (1971) *(leave denied).*

to waive juvenile court jurisdiction to a court of general criminal jurisdiction.

The failure of the Legislature to promulgate standards does not gainsay the desirability of requiring guidelines for the exercise of discretionary power. But, surely, we would not hold unconstitutional the Holmes Act, the indeterminate sentence statute, or the other statutory provisions mentioned (see fn 16) because of the absence of standards in the statute itself. The solution is to formalize sound criteria to govern in future cases now that the need and desirability of structuring the exercise of judicial discretion has been recognized.

## XI

The prosecutor has a broad, totally unstructured discretion in charging that is rarely challenged and, with narrow exceptions, not subject to judicial review.[18]

The police also exercise an undefined but very real discretion in charging, releasing without charge many offenders, particularly youthful offenders.[19]

Two men are arrested for engaging in precisely the same criminal conduct. One may be charged and the other released without charge. The legislative proliferation of the common-law crimes often means that criminal conduct constitutes more than one crime; this generally gives the prosecutor

---

[18] *See* Miller, *Prosecution: The Decision to Charge a Suspect With Crime,* p 154, *et seq.;* Miller & Remington, *Procedures Before Trial,* 339 Annals 111, 113–120 (1962); The President's Commission on Law Enforcement and Administration of Justice—Task Force Report: The Courts, pp 5–8 (1967); Davis, Discretionary Justice, pp 188–190, 224–225 (1969).

[19] *See* Packer, The Limits of the Criminal Sanction, p 291 (1968); Davis. Discretionary Justice, pp 188–190, 224–225 (1969).

a choice of charges to lodge against an offender.
Persons who engage in the same criminal conduct
may be charged with committing different offenses
—the possible penalties they face frequently de-
pend on the charge brought by the prosecutor and
not on the antisocial conduct in which they en-
gage. The judiciary has declined invitations to
control this enormous discretion.[20]

The powers of the prosecutor are not constitu-
tionally established. His duties and powers are
those "provided by law". Const 1963, art 7, § 4.

In the context of the prosecutor's almost unlim-
ited discretion in charging, a power delegated to
him by the Legislature, power which the Legisla-
ture manifestly could structure by more carefully
defining the various penal offenses, power exer-
cised without any of the safeguards that accom-
pany the judicial process, it simply makes no sense
to hold that an adjudication by a probate judge,
guided by fundamentally the same highly general-
ized multichoice standards now formalized by
court rule and statute, was defective because the
Legislature was unaware that its imprimatur
should be added to the judicially-developed stan-
dards.

In contrast with the prosecutor's decision to
charge Fields, the probate judge's decision to waive
jurisdiction of Fields followed a judicial hearing
after notice, Fields was represented by counsel, the
proceedings were stenographically transcribed, the
judge stated the standards by which he felt bound
in reaching his decision, he explained the reasons
for his decision, and there was an opportunity for

---

[20] *Compare Genesee Prosecutor v Genesee Circuit Judge,* 386 Mich
672, 683; 194 NW2d 693 (1972); *People v Jackson,* 29 Mich App 654;
185 NW2d 608 (1971); *People v Graves,* 31 Mich App 635, 188 NW2d
87 (1971); *contrast People v Mire,* 173 Mich 357; 138 NW 1066 (1912).

judicial review of the waiver decision in the appellate courts.

## XII

Standards—the standards added to the waiver of juvenile jurisdiction provision by the Legislature in response to our original opinion—will not eliminate errors in human judgment and in decision making. Standards cannot prevent the arbitrary exercise of power and unjustified discrimination in its administration.

While the standards promulgated by this Court and subsequently enacted by the Legislature are a useful guide for the judicial decision maker, there were few cases in which probate judges were asked to waive jurisdiction before formal standards were promulgated, and still fewer in which waiver orders were entered, where waiver could not have been sustained under the newly-promulgated standards.

The primary safeguards against abuse of discretion by agencies and judges alike—which is at the heart of the objections stated in the originally filed opinion, not delegation as such—are the rights to an evidentiary hearing after proper notice, to representation by counsel and to judicial review upon a transcribed record of the judge's decision elucidated with a statement of facts found and reasons for decision. These safeguards attended the juvenile waiver hearing in this case and have generally been observed in most probate jurisdictions in this state even before *Kent;* they are now formalized in the Juvenile Court Rules of 1969.

The means of protecting juveniles who are improvidently waived to a court of general criminal jurisdiction is appellate intervention. We can pro-

tect against unjustified discrimination in the exercise of the waiver power by encouraging the circuit courts and the Court of Appeals to exercise, and by ourselves exercising, thoughtful review on appeals from orders waiving jurisdiction. This means reading transcripts, weighing the testimony, scrutinizing the reasons advanced for ordering and sustaining the waiver, and, where unconvinced, unhesitating intervention.

We would affirm.

T. G. KAVANAGH, J., concurred with LEVIN, J.

T. G. KAVANAGH, J. *(dissenting)*. When I subscribed the opinion of Justice ADAMS when this case was originally decided, I was persuaded that it accurately stated and applied the law to the case submitted. I am still so persuaded.

Justice LEVIN, however, has convinced me that it makes better sense and better law to give up our insistence on legislatively articulated standards as a constitutional touchstone to define our efforts to safeguard against abuse of discretion.

Accordingly I endorse his opinion.

M. S. COLEMAN and J. W. FITZGERALD, JJ., did not sit in this case.