PEOPLE v PETERS

Docket No. 56622. Argued February 4, 1976 (Calendar No. 4).—Decided August 26, 1976. Certiorari denied by the Supreme Court of the United States November 8, 1976.

Glynn Peters, a juvenile charged with first-degree murder, was convicted, on his plea of guilty, in Recorder's Court of Detroit, John R. Murphy, J., of second-degree murder. The Court of Appeals, V. J. Brennan, P. J., and T. M. Burns and Carland, JJ., reversed on the grounds that waiver of jurisdiction over the defendant by the probate court, James H. Lincoln, J., pursuant to statute, was unconstitutional where the validity of the statute was properly raised and the case was pending prior to the effective date of a Supreme Court decision which invalidated the waiver statute (Docket No. 16327). The people appeal. *Held:*

1. Recorder's Court had jurisdiction of this matter. The Supreme Court adopted JCR 1963, 11 to insure procedural due process in the handling of juvenile waiver proceedings. There is no need to declare the statute on waiver of juvenile jurisdiction unconstitutional because the Court has ample power, through its decisions and rules, to provide adequate constitutional standards to guide judges in waiving jurisdiction over juveniles to courts of general jurisdiction. Unjustified discrimination in the exercise of the waiver power can be protected against by courts on appeal from orders waiving jurisdiction. The transcripts and the reasons advanced by the probate court in ordering waiver show that the instant case is a very clear-cut case for waiver.

2. The defendant's plea of guilty should not be set aside as the product of an allegedly inadmissible confession made some ten months before. The trial court in a hearing on a motion to suppress found the defendant's confession and other evidence of

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 42 Am Jur 2d, Infants § 143.

[2] 20 Am Jur 2d, Courts § 80.

[3] 42 Am Jur 2d, Infants §§ 219, 220.

[5, 6] 21 Am Jur 2d, Criminal Law § 484 *et seq.*

Court's duty to advise or admonish accused as to consequences of plea of guilty, or to determine that he is advised thereof. 97 ALR2d 549.

hair samples and blood taken from the defendant admissible. On the advice of counsel the defendant chose not to risk a trial on the greater charge. The advice he received was well within the range of competence required of attorneys representing defendants in criminal cases. The trial court showed great sensitivity to the seriousness of the defendant's plea and questioned him at length concerning his guilt and the voluntariness of the plea before it was accepted.

Justice Williams concurred except that he did not believe that *People v Fields* is pertinent and disagreed with the comment on it.

Reversed and conviction reinstated.

56 Mich App 305; 224 NW2d 65 (1974) reversed.

*People v Fields,* 388 Mich 66; 199 NW2d 217 (1972), *On Rehearing,* 391 Mich 206; 216 NW2d 51 (1974), overruled in part.

1. INFANTS—PROBATE COURT—JURISDICTION—WAIVER—CRIMINAL LAW —CONSTITUTIONAL LAW.

There is no need to declare unconstitutional the former statute which provided for waiver by the probate court of jurisdiction of a child over the age of 15 years accused of any act the nature of which constitutes a felony; the Supreme Court has ample power, decisionally and through rule making, to provide adequate standards to guide judges in reaching their decisions, and to make both the hearing process and judicial review meaningful (MCL 712A.4; MSA 27.3178[598.4]).

2. CONSTITUTIONAL LAW—STATUTES—STANDARDS.

Courts have refused to allow legislatures to impose nonjudicial functions on them, but there is little support for the proposition that a legislative act which confers power on a court is constitutionally deficient because it lacks standards to guide the court in discharging its judicial duty; the standards test is a judicial safeguard against the action of administrative officials and agencies, not against judicial action.

3. INFANTS—WAIVER—CRIMINAL LAW—APPEAL AND ERROR.

The means of protecting juveniles who are improvidently waived to a court of general criminal jurisdiction is appellate intervention.

4. INFANTS—WAIVER—CRIMINAL LAW.

Jurisdiction over a 17-year-old defendant charged with first-degree murder was properly waived to a court of general criminal jurisdiction where the defendant was charged with a crime

committed under circumstances that indicate he is dangerous, he had a long pattern of committing assaults and other offenses, there would be no suitable program available for him at the juvenile level, and he had been in juvenile court programs for years and had not been rehabilitated.

5. CRIMINAL LAW—CONSTITUTIONAL LAW—PLEA OF GUILTY.

A defendant who makes a plea of guilty may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the plea.

6. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS.

A plea of guilty of second-degree murder by a 17-year-old defendant charged with first-degree murder was not the product of an allegedly inadmissible confession made ten months before where the confession was ruled by the trial court to be admissible along with hair and blood samples taken from the defendant, the defendant received the competent advice of counsel before making his plea, and the trial court questioned the defendant at length concerning his guilt and the voluntariness of the plea before it was accepted.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training & Appeals, and *Arthur N. Bishop,* Assistant Prosecuting Attorney, for the people.

*Carl Ziemba* for defendant.

FITZGERALD, J. The issues are whether the trial court had jurisdiction to accept defendant's[1] plea of guilty to second-degree murder and, if so, whether defendant's plea forecloses his post-conviction attack based on what he alleges was an illegally obtained confession. We conclude that Recorder's Court did have jurisdiction of this matter and that defendant may not successfully attack his plea of

---

[1] Defendant signs his name Glynn Peters, and the probate records so read. The Recorder's Court and Court of Appeals refer to him as Glenn Peters.

guilty on the basis that it was involuntarily in-
duced by his confession.

## FACTS

Janice Ott was stabbed to death in the hallway
of her Detroit apartment building on December 22,
1971. Underneath her body, the police found a hat.
In the hatband was a slip of paper. A purse
containing the victim's identification but no money
was found in the parking lot behind her apart-
ment. Names and telephone numbers on the slip
of paper found in the hat led the police to the
O'Neil home on December 28, 1971. Defendant,
born February 14, 1955, had been residing with
the O'Neils, his cousins. Defendant's mother was
deceased and the whereabouts of his father un-
known. The O'Neils are an adult and married
couple.

When the police came to the O'Neil home, they
were admitted into the house by defendant. He
was placed under arrest for the murder of Janice
Ott. While in the home, the police seized two coats
which appeared to have blood on them. Defendant
was taken to the Youth Home. On December 29,
the police asked permission of the probate court to
take the defendant to police headquarters for the
purpose of taking a blood sample and hair sample,
and the giving of a polygraph test. The probate
court advised that the police would have to first
obtain the consent of the O'Neils. This was done.
The O'Neils then accompanied the defendant be-
fore a referee of the juvenile court. Defendant was
advised by the referee that he had the right to
have an attorney and that one would be appointed
for him if he could not afford one. He was told that
he had the right not to make a statement, and
that statements made by him or the results of

tests performed could be used against him. Defendant indicated that he understood these rights and agreed to submit to the blood, hair and polygraph tests.

At police headquarters a hematologist-serologist took hair samples and blood from the defendant in the presence of Mrs. O'Neil. This technician testified at defendant's waiver hearing and later at the preliminary examination in recorder's court that, because of chemical damage to the hair of defendant, it was possible to match with certainty these hair samples with hair found on the victim's coat. Further, blood found on the defendant's jacket did not match his blood type, but did match the victim's relatively rare AB blood type.

Defendant was then taken to the polygraph room where, in the presence of Mrs. O'Neil, he was read a standard constitutional rights form. He then read the form. The police then had defendant write on the rights form the reason why he wanted to take the test. He wrote "To prove that I didn't do it", and then signed the form. Upon completion of the polygraph, the operator told defendant that he had failed the test. Defendant then said "I did it. I stabbed her." Defendant then gave a more detailed statement to the police completely implicating himself in the robbery-murder of Janice Ott.

Defendant was returned to the Youth Home. The prosecutor petitioned the probate court to waive jurisdiction so that defendant might be prosecuted as an adult on the charge of first-degree murder. Counsel and a guardian *ad litem* were appointed for the defendant. Following a hearing on February 15, 1972, the probate court's decision on the question of waiver was announced on March 6, 1972. The probate court set forth the

standards upon which it based its decision to waive jurisdiction as follows:

"1. Glynn Peters is a fairly large individual for his age. He is now past his 17th birthday. He appears mature. His prior record is extremely bad. It dates back to October 24, 1968 and he has been in Court a considerable number of times since then.

"He is an orphan and has been raised in boarding homes, by relatives, etc. He has had attorneys represent him at a considerable number of hearings. He has had previous convictions, using knives in assaults and robberies.

"In February 1970 he was committed by this Court to the State Department of Social Services, was placed at the Boys Training School, and became a State ward.

"2. The crime with which he is charged is extremely serious. This was not only a robbery with a large knife, but it was committed under circumstances that indicate clearly that he is dangerous.

"3. He has a long pattern of repetitive conduct in committing assaults and other offenses.

"4. There is no suitable program at the juvenile level. He could only be confined until he is 19 years of age and he is now past his 17th birthday.

"Attached hereto is a letter signed by Hartford Smith, Jr., Chairman, Parole and Review Board, Office of Youth Services. He indicates very clearly that there is no program at the juvenile level. It should be pointed out that if he is found guilty of this charge, he needs long term confinement. He was a truant from the Training School at the time of this assault.

"5. It is certainly in the best interests of the public and Glynn Peters that he stand trial as an adult. The public certainly needs protection from Glynn Peters.

"Sometimes the question of waiver presents a very close case. In this case, there is no doubt whatsoever. If found guilty of this charge, Glynn Peters needs long term confinement in a security institution extending years beyond his 19th birthday.

"If he were kept at the juvenile level, he could only be confined until he is 19 years of age. He has been in

juvenile programs for years and none of these programs have done anything to rehabilitate him.

"At the conclusion of the hearing on February 15, 1972, the matter was referred to the Clinic for Child Study and case was continued to March 6, 1972 with the consent of counsel.

"*The matter again comes before the Court on March 6, 1972.* A report had been submitted by Dr. Schornstein of the Clinic for Child Study in which he agreed with the Parole and Review .Board of the Office of Youth Services. He recommended waiver to Adult Court.

"On March 6, Mr. Goodman, the attorney for Glynn Peters was given an opportunity to submit additional testimony and argument. He is an experienced attorney who had carefully protected the record on a number of matters where he challenged the admissibility of evidence.      .

"The Court stated the reasons for waiver as set forth · in this memorandum. Mr. Goodman had a chance to examine and study all the files and records in the case including the Clinic report.

"This is a very clear-cut case for waiver. It is not a close decision. Obviously, if found guilty, Glynn Peters needs long term confinement."

After preliminary examination in recorder's court, defendant was bound over for trial on the charge of first-degree felony murder. Thereafter, a motion to suppress defendant's confession was heard and denied as were motions to suppress a lineup identification and an anticipated in-court identification. A motion was also filed to quash the information on the basis of the alleged unconstitutionality of the waiver statute. This motion was likewise denied without prejudice to refiling after the rehearing of *People v Fields,* 388 Mich 66; 199 NW2d 217 (1972).

On October 26, 1972, defendant appeared in open court and pled guilty to the included offense

of murder in the second degree. The transcript of the plea proceedings before the late Judge John R. Murphy is set forth at length in the appendix following this opinion.

Defendant was thereafter sentenced to life imprisonment. The Court of Appeals reversed at 56 Mich App 305; 224 NW2d 65 (1974), holding that recorder's court lacked jurisdiction in the matter by reason of our decisions in *People v Fields, supra,* adhered to on rehearing, 391 Mich 206; 216 NW2d 51 (1974). We reverse and reinstate defendant's conviction.

I

We note first that in *People v Fields, supra,* the contested waiver of jurisdiction occurred in 1968, before the adoption of JCR 1969, 11. Therefore, the effect of the standards for waiver set forth in JCR 11 upon the question of lack of standards in the waiver statute was not before the *Fields* Court. Second, the argument advanced by defendant that this Court could not by court rule constitutionally insure *procedural* due process in the handling of juvenile waiver proceedings was rejected, at least by implication, even by the majority in *Fields* on rehearing:

"While this Court cannot enact substantive laws, it does have the authority to decide upon the procedures to be followed in the courts of this state. Such authority has been exercised by adopting the General Court Rules for courts of general jurisdiction, the District Court Rules for the district courts, and the Juvenile Court Rules. Being fully cognizant of the problems created by the decisions of the United States Supreme Court in *Kent, supra* [383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966)], and *In re Gault,* 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967), the Probate Court Committee of this

Court, * * * undertook with the help of the probate judges, to insure *procedural* due process in the handling of juvenile court cases. Any question pertaining to JCR 1969, 11, is not before the Court in this case since it was not in effect at the time the action of the probate judge herein reviewed took place." 391 Mich at 215–216.

Finally, we must express our disagreement with the holding of the majority opinion in *Fields* on rehearing, and our agreement with the reasoning of dissenting Justice LEVIN when he stated:

"There was and is no need to declare the waiver of juvenile jurisdiction provision unconstitutional. This Court has ample power, which it has exercised both decisionally and through rule making on countless occasions, to provide adequate standards to guide judges in reaching their decisions, and to make both the hearing process and appellate review meaningful.

"The judiciary of this state in establishing waiver criteria both before and after the decision in *Kent v United States,* 383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966), did precisely what judges have been doing for centuries—filling in gaps in a statute. Especially where power has been delegated to a court, it can frequently find the 'intelligible principle' in its own jurisprudence and in the decisions of other courts dealing with like problems." 391 Mich at 239–240. (Footnotes omitted.)

\* \* \*

"While the courts have refused to allow Legislatures to impose nonjudicial functions on them, there is little support for the proposition that a legislative act which confers power on a *court* is constitutionally deficient because it lacks standards to guide the court in discharging its judicial duty. The standards test is a judicial safeguard against the action of administrative officials and agencies, not against judicial action." 391 Mich at 244. (Footnote omitted.)

\* \* \*

"The means of protecting juveniles who are improvidently waived to a court of general criminal jurisdiction is appellate intervention. We can protect against unjustified discrimination in the exercise of the waiver power by encouraging the circuit courts and the Court of Appeals to exercise, and by ourselves exercising, thoughtful review on appeals from orders waiving jurisdiction. This means reading transcripts, weighing the testimony, scrutinizing the reasons advanced for ordering and sustaining the waiver, and, where unconvinced, unhesitating intervention." 391 Mich at 251–252.

Our reading of the transcripts and the reasons advanced by the probate court in ordering waiver convinces us that jurisdiction was not improvidently waived and, in fact and as stated by the probate court, "[t]his is a very clear-cut case for waiver". To the extent that *People v Fields, supra,* is not supportive of our decision today, it is overruled.

## II

Defendant argues that (1) the probate court acted in violation of its role of *parens patriae* when it allowed him to go to police headquarters for evidentiary purposes, (2) that his confession at the conclusion of the polygraph examination would therefore have been inadmissible in a trial of him in adult court, and that (3) his plea of guilty on the advice of counsel to a reduced charge some 10 months later[2] was the product of the allegedly inadmissible confession. He asks us to set aside the plea as involuntary. We need not reach the merits of defendant's first two contentions in order to reject the third:

---

[2] We note that defendant was 17 years of age at the time of his plea, and that he was 17 when jurisdiction was waived to Recorder's Court.

"[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v Henderson,* 411 US 258, 267; 93 S Ct 1602, 1608; 36 L Ed 2d 235 (1973).

*Tollett* reaffirmed the principle recognized in the 1970 *Brady* trilogy: *Brady v United States,* 397 US 742; 90 S Ct 1463; 25 L Ed 2d 747, *McMann v Richardson,* 397 US 759; 90 S Ct 1441; 25 L Ed 2d 763, *Parker v North Carolina,* 397 US 790; 90 S Ct 1458; 25 L Ed 2d 785. In *Parker* the Supreme Court rejected the argument that the guilty plea of a 15-year-old youth accused of burglary and rape was the involuntary product of a coerced confession:

"[B]ut we need not evaluate the voluntariness of petitioner's confession since even if the confession should have been found involuntary, we cannot believe that the alleged conduct of the police during the interrogation period was of such a nature or had such enduring effect as to make involuntary a plea of guilty entered over a month later." 397 US at 796.

See also *People v Morris,* 57 Mich App 573; 226 NW2d 565 (1975), leave denied 394 Mich 751 (1975).

The same arguments advanced by defendant in this Court in support of his assertion of an involuntary plea were made in the trial court on the motion to suppress. That motion was denied and defendant's confession as well as other evidence was ruled admissible. On the advice of able counsel, defendant chose not to risk a trial on the

greater charge and the possibility that an appellate court would uphold the trial court's evidentiary ruling in the event of a conviction. A review of this record convinces us that "the advice he received was well within the range of competence required of attorneys representing defendants in criminal cases". *Parker, supra,* 397 US at 797–798. A reading of the plea transcript manifests beyond peradventure that the trial court showed great sensitivity to the seriousness of defendant's plea and questioned him at length concerning his guilt and the voluntariness of the plea before it was accepted. *Parker, supra,* 397 US at 816 (Brennan, J., concurring in *Brady).*

The Court of Appeals is reversed. Defendant's conviction on his plea of guilty to murder in the second degree is reinstated.

KAVANAGH, C. J., and LEVIN, COLEMAN, LINDEMER, and RYAN, JJ., concurred with FITZGERALD, J.

WILLIAMS, J. I concur except that I believe *Fields, supra,* not pertinent, and I further disagree with comment thereon.

## APPENDIX

*The Court:* File number 72-01666, People versus Glynn Peters. Mr. Peters, do you understand what you're charged with?

*The Defendant:* Yes, sir.

*The Court:* Let me tell you specifically, so there will be no question about it. The police and the Prosecutor claim that on December the 22nd, 1971, that you were in an apartment building at 905 Merton Street in the City of Detroit. They claim that you were armed with a weapon, that

you went there to rob a lady named Janice Ott. That you were robbing her and that during the course of that robbery you killed her and that that killing constituted murder in the first degree. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* Mr. Hill?

*Mr. Hill:* May it please the Court, I've been over the factual situation with this defendant. The Court has asked this defendant. He's aware of the present charge pending against him. We have conducted an examination in this matter. And we've had a motion in the matter. I've reviewed the law with him and the facts applicable to that law. I've given him the best advice I know how. And based upon that advice it's his decision to, at this time, withdraw his former plea heretofore, that plea being not guilty. And enter a plea of guilty to the included offense of murder in the second degree. I've explained to him the difference between the charge now pending in the complaint and warrant, that charge being first degree murder. And I've explained to him that if he was convicted of that charge the court would be duty bound to impose a mandatory life sentence, if he was convicted of the charge as it now exists.

However, if he offered a plea to the included offense of second degree murder, the punishment can be any number of years up to and including life. And based upon that difference in *[sic]* his decision now to offer a plea to the included offense of second degree murder.

*The Court:* Thank you, Mr. Hill. Mr. Peters, how old are you today?

*The Defendant:* Seventeen.

*The Court:* Back on December the 22nd of 1971, you were sixteen years old, is that correct?

*The Defendant:* Yes, sir.

*The Court:* And when you were arrested and charged in this case you were sixteen years old, right?

*The Defendant:* Yes, sir.

*The Court:* And you had a hearing in Juvenile Court before Judge Lincoln where Judge Lincoln had to decide whether to treat you as a juvenile or where you should be treated as an adult, isn't that right?

*The Defendant:* Yes, sir.

*The Court:* And you were waived over to Recorder's Court for trial, right?

*The Defendant:* Yes, sir.

*The Court:* And Mr. Hill was appointed to represent you on this charge, isn't that true?

*The Defendant:* Yes.

*The Court:* Has he conferred with you and talked with you on a number of occasions about this case?

*The Defendant:* Yes.

*The Court:* And have you told him all of the facts in this case? Have you told him everything that happened in this case?

*The Defendant:* Yes, sir.

*The Court:* And has he explained to you what the law is?

*The Defendant:* Yes.

*The Court:* Do you think you understand everything that he told you?

*The Defendant:* Yes, sir.

*The Court:* If you were only sixteen years old when you were arrested, were you going to school?

*The Defendant:* Yes.

*The Court:* Have you quit school?

*The Defendant:* Yes.

*The Court:* Where were you going to school?

*The Defendant:* Kettering High School.

*The Court:* What grade were you in when you quit?

*The Defendant:* Ten B.

*The Court:* Has all your schooling been in Detroit?

*The Defendant:* Yes.

*The Court:* You're from Detroit, born here?

*The Defendant:* Yes.

*The Court:* Have you ever been in trouble—well, you weren't an adult, so you couldn't have ever been charged with a felony before, right?

*The Defendant:* Yes, sir.

*The Court:* You have been in trouble before as a juvenile, is that true?

*The Defendant:* Yes.

*The Court:* Do you think you know what a jury trial is?

*The Defendant:* Yes, sir.

*The Court:* Have you ever seen one in real life?

*The Defendant:* No, sir.

*The Court:* Have you ever seen one in the movies or on television?

*The Defendant:* Yes, sir.

*The Court:* You have some idea then what they look like?

*The Defendant:* Yes, sir.

*The Court:* Do you understand that you have a Constitutional Right to have a trial with a jury on this charge of first-degree murder?

*The Defendant:* Yes.

*The Court:* You know that that means that you have a right to have twelve independent citizens, elected to be the jury, to hear the facts in your case?

*The Defendant:* Yes.

*The Court:* Okay. If you were to have a jury trial you and Mr. Hill would come to Court and you would have clothes to wear so that you wouldn't have to wear that prison uniform. You and Mr. Hill would come to Court. You'd sit down at one table, the Prosecuting Attorney and Sergeant Roffey—do you know who Sergeant Roffey is?

*The Defendant:* Yes.

*The Court:* From the Homicide Bureau. Him and the Prosecutor would sit down at the other table. We'd get maybe fifty or sixty jurors down here and Mr. Hill and the Prosecutor would pick twelve of them to sit on the jury in your case. Once they pick the twelve then the trial would start.

One by one every person that knows anything about your case, anyone who has accused you of this crime, would have to come to Court and get up there on that witness stand and answer questions about the case that the Prosecutor would ask. The jury would be there, you'd be here, the jury would hear what those witnesses had to say.

When the Prosecutor is done asking each witness some questions Mr. Hill would have a chance to ask those witnesses questions. Mr. Hill could question the witnesses, cross examine the witnesses, he could try to show that those witnesses were making a mistake, or that they were lying or that they didn't know what they were talking about or that they shouldn't be believed. And he could ask them any questions that you wanted him to ask also. Do you understand?

*The Defendant:* Yes, I do.

*The Court:* Okay. After all of the witnesses that the police knew anything about had testified there might be some people that you would want to have come to court. And if you had some witnesses that

you wanted to come to court and testify in your behalf we would get a subpoena, a court order, and make those people come down here to court, make them get on the witness stand and make them testify, if they had some testimony that was favorable to you. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* Then there might come a time when you'd want to get up on that witness stand. And if you wanted to you could. But if you didn't want to testify you wouldn't have to. And if you didn't want to say anything nobody could say anything about it. Nobody could tell the jury 'Glynn Peters should have testified.' Nobody could say to the jury 'how come Peters didn't testify'. Nobody could say to the jury 'if Peters was innocent he would have testified.' Nobody could even mention the fact that you didn't want to testify. Or that you hadn't testified. Do you understand that?

*The Defendant:* Yes.

*The Court:* Okay. Now, while the trial was going on you'd be sitting there with Mr. Hill and the jury would be able to see you. The jury couldn't look over there and say 'well, he must have done something or the police wouldn't have him'. The jury could not say that. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* The jury, the twelve people on the jury would have to keep in mind this thought. They would have to keep thinking, 'I assume that Glynn Peters didn't do anything wrong.' 'And I'm going to keep assuming that until after I've heard all of the evidence.'

Now, what that means is the jury couldn't even start to think that you might be guilty until after they heard all of the evidence and all of the facts in the case. Understand?

*The Defendant:* Yes, sir.

*The Court:* Are you sure?

*The Defendant:* Yes, sir.

*The Court:* Okay, that's called the presumption of innocence. The jury has to presume that you're innocent until they hear all the evidence, okay?

*The Defendant:* Yes, sir.

*The Court:* After the jury did hear all the evidence, they'd go into that room there where it says jury (indicating) and twelve of them would talk about the case. Now, those twelve people could not find you guilty unless all twelve of them were completely convinced that you had committed this murder. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* If one of them had a doubt they could not find you guilty. They would all twelve of them be completely convinced that on December the 22nd you were there on Merton Street in that apartment building. They'd have to be completely convinced that you were there to rob that lady, and they'd have to be completely convinced that she was killed during the course of that robbery. They'd have to be totally convinced about that. Do you understand?

*The Defendant:* Yes.

*The Court:* Okay. And you know that you would never be alone at that trial, if we had it. Mr. Hill would always be with you. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* Now, you just heard Mr. Hill tell me that you didn't want a jury trial. And I tried to explain to you just now what a jury trial is all about. Do you understand everything that I just told you?

*The Defendant:* Yes, sir.

*The Court:* Do you want to have the jury trial?

*The Defendant:* No, sir.

*The Court:* Mr. Hill told me that you want to withdraw your plea of not guilty to the charge of first-degree murder. You know, you've pleaded not guilty since your arrest back in December of '71.

*The Defendant:* Yes, sir.

*The Court:* He said, Mr. Hill said, that now you want to plead guilty to a lesser charge called second-degree murder. Is that what you want to do?

*The Defendant:* Yes, sir.

*The Court:* Do you understand, Mr. Peters, that if you plead guilty to second-degree murder you might go to prison for the rest of your life?

*The Defendant:* Yes, sir.

*The Court:* All right. And when I talk about a life sentence that means I could start with any number of years. I could start with a sentence that had a forty year minimum or a sixty year minimum or a hundred year minimum. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* All right or just impose a straight life sentence. Do you understand that?

*The Defendant:* Yes, sir.

*The Court:* Do you know the difference between a first degree murder life sentence and a second degree murder life sentence?

*The Defendant:* I think so, sir.

*The Court:* First degree murder is you serve life, and that means until you die. And you can't ever be paroled. Do you understand the difference?

*The Defendant:* Yes, sir.

*The Court:* Did anybody tell you that if you plead guilty you'd get an easy sentence?

*The Defendant:* No, sir.

*The Court:* Did anybody tell you that what sentence you'd get?

*The Defendant:* No, sir.

*The Court:* Did anybody make you any promises? Or did anybody threaten you? Or did anybody say anything to you to get you to plead guilty?

*The Defendant:* No, sir.

*The Court:* Has anybody told you that you had to plead guilty?

*The Defendant:* No, sir.

*The Court:* Is it your decision and yours alone?

*The Defendant:* Yes, sir.

*The Court:* Why do you want to plead guilty, Mr. Peters?

*The Defendant:* Because, like, I feel like I'm man enough to stand up for what I did. For what I did wrong.

*The Court:* Are you telling me that you are guilty of this crime?

*The Defendant:* Yes.

*The Court:* Do you remember the day of December the 22nd, 1971?

*The Defendant:* Yes, sir.

*The Court:* Do you know where 905 Merton Street is?

*The Defendant:* Yes.

*The Court:* Tell me what you did on that day? You tell me what you did on December the 22nd, 1971 on Merton Street?

*The Defendant:* Well, like, Christmas was coming up, and, like, I didn't have nothing, and I wanted to get the family something. So, like, the people that lives in there was in the front room. I

told them I was going out for awhile. And they said, 'All right.'

So I went towards Six Mile, and then I got on Merton and the lady she drove up and I went past her. And when she went in the parking lot I doubled, came back, and she put her key in the door—.

*The Court:* She what? Put her key in the door?

*The Defendant:* Yes. In the back door. And I went up behind the lady and she ran upstairs, and I went up behind her and I put my arm around her neck and told her to give me the money.

*The Court:* Did you have a weapon?

*The Defendant:* Yes.

*The Court:* What kind of weapon?

*The Defendant:* A small kitchen knife.

*The Court:* Did you have that out at the time you grabbed her around the neck?

*The Defendant:* No.

*The Court:* You grabbed her around the neck and you told her to give you the money, right?

*The Defendant:* Yes.

*The Court:* Then what happened?

*The Defendant:* She said, 'All right.' And then she started screaming, she started backing up, she was going to fight me, I just panicked.

*The Court:* And what did you do when you panicked?

*The Defendant:* Stabbed her.

*The Court:* You got that knife out at some time, right?

*The Defendant:* Right.

*The Court:* Do you know where it was that you stabbed her? What part of her body?

*The Defendant:* In the abdomen, I think.

*The Court:* Do you remember how many times?

*The Defendant:* No.

*The Court:* Then what did you do?

*The Defendant:* Ran. I threw the knife up on the roof right behind her apartment, and I still had the purse, and I took the money out of the purse and put the purse between two parked cars in the parking lot.

*The Court:* You did take the money out of the purse?

*The Defendant:* Yes.

*The Court:* Do you remember how much you got?

*The Defendant:* No.

*The Court:* And you left the purse between two parked cars?

*The Defendant:* Right.

*The Court:* Then what did you do?

*The Defendant:* Ran home.

*The Court:* You were arrested a few days later, weren't you? A week or so later?

*The Defendant:* Yes.

*The Court:* And you were taken to Juvenile Court, right?

*The Defendant:* Right.

*The Court:* And within a day or two after that you came downtown and were given a lie detector test, right?

*The Defendant:* Yes.

*The Court:* And at the time of that lie detector test you made a statement to the police, didn't you?

*The Defendant:* Yes.

*The Court:* And in that statement you told the police what you had done, true?

*The Defendant:* Yes.

*The Court:* At the time you made that statement

did you know that you didn't have to tell the police anything?

*The Defendant:* Yes.

*The Court:* Had they warned you that you had a right to remain silent?

*The Defendant:* Yes.

*The Court:* And they warned you that anything you said could be used against you?

*The Defendant:* Yes.

*The Court:* And they told you that you could have a lawyer present?

*The Defendant:* Yes, sir.

*The Court:* Had they told you that they would appoint a lawyer to represent you if you couldn't afford to hire one?

*The Defendant:* Yes, sir.

*The Court:* Did they tell you that if you started to talk you could stop talking at any time?

*The Defendant:* Yes.

*The Court:* And you went ahead and made a statement to them, is that right?

*The Defendant:* Yes, sir.

*The Court:* Okay, was that statement true?

*The Defendant:* Yes.

*The Court:* Did anybody force you to make it?

*The Defendant:* No, sir.

*The Court:* You have made a statement here today, haven't you, Mr. Peters?

*The Defendant:* Yes, sir.

*The Court:* Have you made that statement today of your own free will?

*The Defendant:* Yes.

*The Court:* Have you told me the truth?

*The Defendant:* Yes.

*The Court:* Have you told me everything that you want to tell me about what happened out there on Merton Street?

*The Defendant:* Yes, sir.

*The Court:* Do you understand what you've done here?

*The Defendant:* Yes, sir.

*The Court:* First of all, with regard to your jury trial. You gave up your right to have a jury trial, didn't you?

*The Defendant:* Yes, sir.

*The Court:* Do you still want to give it up?

*The Defendant:* Yes, sir.

*The Court:* You confess to this crime?

*The Defendant:* Yes.

*The Court:* You plead guilty to it, you understand that?

*The Defendant:* Yes.

*The Court:* And that puts an end to this case except for the sentence?

*The Defendant:* Right.

*The Court:* Do you understand that when you come back to be sentenced that you might be sentenced to prison for the rest of your life?

*The Defendant:* Yes, sir.

*The Court:* It's not too late to change your mind. Do you still want to plead guilty to second-degree murder?

*The Defendant:* Yes, sir.

*The Court:* I'll accept the plea of guilty to second-degree murder, and I'll refer the defendant to the Probation Department for pre-sentence investigation report. And I'll set sentencing for the 22nd day of November. And he will be remanded to the custody of the sheriff until that date.